[Crim. No. 4431.   Second Dist., Div. Two.   July 6, 1950.]

THE PEOPLE, Respondent, v. CHARLES MILTON LLOYD, Appellant.

Richard E. Erwin for Appellant.

Fred N. Howser, Attorney General, and Gilbert Harelson, Deputy Attorney General, for Respondent.

MOORE, P. J.—Having been convicted of murder upon purely evidential circumstances appellant demands a reversal upon the grounds of insufficiency of the proof, error in not properly instructing the jury, denial of due process and equal protection of the law under state and federal Constitutions. While serious questions are raised as to the evidence of both motive and identity, the question for decision is whether the jury could fairly have convicted the accused upon the facts established at the trial.

Deceased, Faxon A. Robinson, resided alone in a cottage on Clark Street in El Monte, a suburb of Los Angeles. He spent his days in bookmaking, i.e., selling bets on horse races and had his headquarters at Gay's Inn, a saloon in El Monte, where

he conducted operations daily from 11 a. m. to 7 p. m. His habit of carrying on his person from $200 to $400 was known to appellant who had been his friend for about a year prior to February 18, 1949, and who had from time to time placed bets with and borrowed sums of money from him. On the evening of the day last mentioned, deceased left Gay's about 6 p. m., dined at a nearby café with the witness Letha Toth who accompanied him in a taxicab to his home about a mile distant. He was drunk upon their arrival. She observed him place on the dresser a stack of currency about three-fourths of an inch in thickness, including two $20 bills. Also, he checked up on his day's receipts on a small scratch pad on which he listed four checks, $300 cash, and the figures ''$79.'' Concerning the last item there was no evidential explanation. With Miss Toth's assistance he donned his night shirt, repaired to his bed and was soon in slumberland. Thereupon, his companion took $1.75 of his money; left a note that she had done so; turned off the lights and departed by the back door which she left unlocked. His body was found at 11 a. m. on the following day by Charles Kneedler.

On February 18 appellant was a plumber and was usually employed. He was indebted to Gay's Inn in the sum of $45 and to his employer in the amount of $75. For the preceding week ending February 12 he had received $45.12 as wages. On the afternoon of February 18 he arrived at Gay's Inn about 4:30 o'clock. For about three hours he loitered there in the enjoyment of his cups. During that period he wore blue denim clothes, a jacket and a cap. When he left at 8 p. m. he paid for his drinks with small bills which he removed from a front pocket. He returned at 8:30, sat at the lunch counter, ate and drank until 9. He then went out into a cold, foggy night. A figure similar to his was at the scene of the crime shortly after 9 p. m. according to the testimony of a Mrs. Evans who resided in the block adjoining that in which deceased lived. She testified that as she drove north on Clark Street she saw a tall, thin man in work clothes walking from the Robinson home across the lawn toward the street; that his build was similar to that of appellant's.

On his return to the saloon about 11:30 his hair hung over his forehead, he wore no cap as he had done prior to 9 o'clock; had much dirt on his clothes; ''looked like he had been wallowing in the dirt.'' This, he explained, resulted from his having had trouble with his car in that it would not start. He sat

around for a while, drank and paid for drinks with money taken from a wallet carried in his hip pocket. Prior to that time the bartender had never seen him take money from that part of his clothing. The stack of bills removed was three-eighths of an inch in thickness. He paid first with a $20 bill. About 15 minutes later he paid someone a loan and ordered more drinks for several persons present and said, "I am going to have to give you another $20 bill." He left Gay's Inn about 12:15 a. m. and directed his course toward the home of deceased. About 12:40 a. m. an automobile resembling his was parked about 350 feet from the Robinson home.

Approximately 10 a. m. on the 19th witness Kneedler arrived at Gay's saloon for the purpose of placing a bet with Robinson. To calm the fears of Mr. Westerman who had been Robinson's associate, Kneedler drove to the home of deceased and on getting no response to his knocking attempted entrance at the back door. After telephoning to Westerman from a neighboring station he returned to the house, observed the broken screen on the bedroom window open, unhinged and hanging out. On entering the house he found deceased and blood stains in profusion.

The police having been informed arrived at noon and entered through the window at the broken screen, all doors being locked. Officer Ervin found a ring on the finger of deceased, a setting containing no stones, but he observed three small pieces of onyx in the bed covers and a gold initial letter "R" in the bed. On the dresser he found some checks and appellant's watch, but no stack of bills, While the official inspection was in progress Harold Westerman entered. When he thereafter returned to Gay's Inn, appellant said to him, "You rode down to Frankie's house with Harris in my car didn't you?" "Yes," answered Westerman. Then appellant inquired, "Is he dead?" Prior to that dialogue neither Westerman nor Harris had told anyone of the conditions at the Robinson home.

The autopsy disclosed that death was due to a "cerebral hemorrhage and contusion due to multiple fractures of the skull." Such fractures had been caused by more than 30 blows administered by a plumber's auger, The pattern of the head wounds showed that they were caused either by the auger taken from appellant's car or by one identical with it. Also, the ring on Robinson's finger had been struck by appellant's auger. This is an instrument used by appellant in his plumbing trade "for drilling holes through floor and ceiling joints

to run 2″ vent pipes.'' In the car with the auger the officers found a cap and jacket similar to those he wore to work on the preceding day.

Blood was found in several places in appellant's automobile and a large stain on the inside of the door just below the window was human blood. Appellant's cap was ''rather dirty and . . . the stain was not covered with dirt, which would indicate that . . . the cap had not been worn since it was put on and had not been in any place where it could get dirty.'' Scrapings taken from the underside of appellant's right hand were found to contain blood. When Officer England exhibited to appellant a red-like substance on the auger the morning of the 20th, the latter replied, ''I suppose you are going to tell me that's blood.''

A metal analysis was made of decedent's ring. It contained 42 per cent gold, 45 per cent silver, the balance, copper, lead and nickel. A similar examination was made of the auger for the purpose of ascertaining whether it had contacted the ring. A small dent and an adjacent marred area were found. A spectographic analysis of samples taken from the marred area and from the bottom of the dent showed aluminum, gold, silver, copper and a trace of lead. That analysis compared exactly with the analysis of the ring, with the addition of aluminum which came from the auger. The witness' opinion was that decedent's ring had come into contact with the auger and had caused the two wounds above and to the left of the left eye. The foregoing facts were established by three experts learned in chemistry and skilled in chemical analyses.

Appellant was taken to the police station about midnight on February 19 for questioning. When Officer England showed him the auger he said to the prisoner, ''I believe you killed Frankie Robinson. In fact, I am sure you did.'' No reply. ''You are a cold blooded murderer,'' continued the officer, and some seconds elapsed in silence. When asked whether he could explain the presence of blood under his fingernails, appellant said that he could not do so.

The only motive ascribed to appellant was his dire need for money. His choice of Robinson as a source of a new supply was encouraged by his knowledge that deceased usually carried from $200 to $400 on his person. He was in debt; drank intemperately and reveled in such society as commonly frequents the barroom. His own money had been squandered on drink prior to his leaving Gay's Inn. When he returned

he was flush with a new supply. In a brief time he had broken two $20 bills. Not only do the facts established to the satisfaction of the jury show motive and opportunity for the crime but the murder weapon, peculiarly formed, was traced to appellant's possession, and his claim of innocence of murder required him to deny the accusation and to resent the accuser. (*People* v. *Simmons*, 28 Cal.2d 699, 712, 715 [172 P.2d 18].) Although he was accused on the 19th he did not deny his guilt until the 21st. Now on this appeal he arrays a list of persons who, he says, had the knowledge of deceased and of the latter's possession of money. He asserts they had motives for the crime and contends that the jury should have exonerated him under the doctrine governing circumstantial evidence. But those very things were before the jury whose duty was to determine whether any of the parties named by appellant had an equally burning motive to take Robinson's life, as full knowledge of his pecuniary possession and as intimate a knowledge of the route to his door. ■ Whether the evidence of any circumstance was a necessary link in the chain of proof was essentially a question for the jury. (*People* v. *Watts*, 198 Cal. 776, 799 [247 P. 889].) Since their finding of his guilt is not unreasonable it cannot be said that the evidence is insufficient.

■ Appellant complains that the critical area of the evidence consists of expert analyses of blood and metals and that there was room for reasonable doubt in the minds of a reasonable jury. Such crimes as murder for money are done in solitude and often in darkness. For that reason the State finds it unavoidable to resort to the microscope, to chemistry and to fingerprints to find its way to the identity and the heart of a criminal. Such methods and facilities are not arbitrary but are customary. The weight to be given the testimony of such experts depends upon the reasons they assert. (*People* v. *Martin*, 87 Cal.App.2d 581, 584 [197 P.2d 379].) The reasons they give and the opinions they assert are expressed in intelligible and simple language. But however wise and learned they appear, a conviction cannot be based upon their testimony unless the jury are convinced of their correctness and their credibility. (*People* v. *Murray*, 91 Cal. App.2d 253, 256 [204 P.2d 624].) ■ When on appeal the unreasonableness of a verdict is the basis upon which a reversal is demanded the criterion by which the verdict under consideration is to be measured is whether a jury of reasonable men could have derived such verdict, assuming the exis-

tence of every fact which could reasonably have been deduced under correct instructions. (See *People* v. *Newland*, 15 Cal. 2d 678, 681 [104 P.2d 778].) The trial court's approval of a verdict by denying a motion for a new trial is further proof of the reasonableness of the evidence adduced.

## THE JURY WERE PROPERLY INSTRUCTED

Appellant contends that since there were no witnesses to the crime and since he denied all knowledge of the deed, the court presumed malice and premeditation instead of submitting those issues to the jury. No basis for such contention exists. He argues that "by reason of the fact that no second degree instruction was given it is fair to say that the presumption or implication was made by the judge, for the jury had no choice in the matter."

Appellant intended to say that the court prejudiced the prisoner by not charging on second degree murder and in not preparing a blank verdict accordingly. The facts established by the prosecution witnesses prove nothing short of murder in the first degree. Since appellant denied *in toto* such testimony, denied his presence on the premises of the deceased on the night of the murder, why should the court have confused the sole issue of murder in the first degree with instructions concerning, and definitions of, crimes included in the crime charged? In charging a jury, the court should be guided by the facts proved. ▮ When a person is accused of murder in the first degree, if the evidence is of such nature as to warrant a verdict for no lesser crime, if the defendant is guilty at all, the court should refuse to instruct as to crimes included within first degree murder. By so doing the court does no violence to the constitutional inhibition against instructing with respect to matters of fact. (*People* v. *Watts*, 198 Cal. 776, 793-4 [247 P. 884].) Thus, the court below was wholly justified in not charging with respect to second degree murder or any less savage offense since there was no evidence tending to show such milder crimes. (*Ibid.* p. 794.) The same question was raised in *People* v. *Sameniego*, 118 Cal.App. 165, 171 [4 P.2d 809, 5 P.2d 653], wherein the appellant accused of first degree murder contended that the court erred in not instructing the jury as to the law of murder in the second degree in order that the jury might return a verdict for the lesser offense. The contention was rejected for the reason that all the evidence proved that the homicide was a murder of the first degree. Just as in the Watts case, *supra*, there was no

evidence in mitigation, justification or excuse; and as in the case at bar the totality of their efforts was devoted to establishing an alibi.*

## Due Process Not Denied

Appellant alleges prejudicial error in that after the cause had been submitted to the jury they were separated and that during the period of separation a part of them were in the custody of Margaret Castellaw, a deputy sheriff who had not been sworn as a bailiff to guard them as provided by statute. While it is true that the Penal Code (§§ 1128, 1440) requires that an officer must be sworn to keep the jury "together in some private and convenient place, and not to permit any person to speak or to communicate with them, nor to do so himself, unless by order of the court," yet no prejudice is shown to have been suffered by appellant by reason of the presence of Deputy Castellaw. The court's regular male bailiff, Berna Oliver, was sworn to take charge of the jury after the instructions had been given on August 11 and he continued in the performance of such duty until the verdict was returned. Two hours after deliberations had commenced, Miss Castellaw was assigned to assist in the care of the jury. The customary oath provided for by section 1440, *supra,* was not administered to her until 5:30 p. m. on August 12. In the interim she entered the jury room but once when Bailiff Oliver was absent. The purpose of that visit was by direct order of the court to determine the extent of the illness of Mrs. Cooper, a jurywoman. On another occasion while the jury were at the hotel, it was necessary to convey half of them on one elevator, while the remainder were lifted by the second elevator to the eleventh floor where they all convened again. At no time prior to 5:30 on the 12th did she speak in the presence of any member of the jury concerning any fact or evidence presented in the trial of appellant. From the foregoing resumé of the evidence upon the subject of the irregularity in Miss Castellaw's not having been sworn prior to her caring for and guarding the jury, it is readily apparent that the want of due process is not ground for reversal in the absence of a showing that appellant was prejudiced by any act of the unsworn bailiff or that such officer did not faithfully perform her official duties. (*People* v. *Pompa,* 192 Cal. 412, 423 [221 P. 198].)

---

*See 8 Cal.Jur. p. 378 where the editor sets forth an extensive array of authorities and includes an intelligent section (410) in support of the doctrine.

Moreover, appellant is in no position to gain advantage from the court's neglect promptly to swear the female officer. It was his duty to request the court to swear the lady when she was called into court for the purpose of assisting in the care of the women jurors. ■ It is the duty of counsel in every trial of a person charged with crime to render such assistance as is within his power to enable the court to avoid error; and when he remains silent while the court does or allows an unauthorized act, he waives the right of reversal by reason thereof. This is especially true in the matter of the court's failure to swear a bailiff to attend a jury during its deliberations. (*Dreyer* v. *People,* 188 Ill. 40 [58 N.E. 620, 59 N.E. 424, 58 L.R.A. 869].)

■ The contention that appellant was deprived of equal protection of the law because the jury were separated in the period of their deliberations has no support in authority or in reason. They could not reach the eleventh floor of the hotel except by going on two elevators or by climbing the stairway. To do the latter would have been impracticable. The necessity for the women to have their separate rooms for sleeping was likewise a practical solution of the problem presented by section 1440 of the Penal Code which requires the bailiff to keep the jury together. Every statute enacted for the purpose of prescribing the mechanics or machinery of a court or the handling of a jury must be given a reasonable interpretation. When error is assigned by reason of a separation of the jurors during their deliberations, the presumption of prejudice is rebutted when the prosecution shows by satisfactory evidence that no prejudice has resulted. (*People* v. *Martin,* 87 Cal.App.2d 581, 590 [197 P.2d 379]; *People* v. *Truesdell,* 124 Cal.App. 360 [12 P.2d 476].)

The cases cited by appellant (*People* v. *Cross,* 64 Cal.App. 443 [221 P. 684]; *People* v. *Brannigan,* 21 Cal. 337; *People* v. *Hawley,* 111 Cal. 78 [43 P. 404]; *People* v. *Maughs,* 149 Cal. 253 [86 P. 187]; *People* v. *Adams,* 143 Cal. 208 [76 P. 954, 101 Am.St.Rep. 92, 66 L.R.A. 247]) are clearly distinguishable.

The judgment and order denying the motion for a new trial are affirmed.

McComb, J., and Wilson, J., concurred.

A petition for a rehearing was denied July 18, 1950, and appellant's petition for a hearing by the Supreme Court was denied August 3, 1950. Carter, J., voted for a hearing.