[Crim. No. 14328. In Bank. Apr. 2, 1973.]

THE PEOPLE, Plaintiff and Respondent, v.
ROBERT LEE DUREN, Defendant and Appellant.

**COUNSEL**

Carl B. Shapiro, under appointment by the Supreme Court, for Defendant and Appellant.

Evelle J. Younger, Attorney General, William E. James, Assistant Attorney General, Norman H. Sokolow and Robert R. Granucci, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**THE COURT.**—In an information filed by the District Attorney of Los Angeles County, defendant was charged with five counts of murder, one of assault with intent to commit murder, and two counts of robbery. Defendant was also charged with one prior felony conviction (Pen. Code, § 211), which he first denied but later admitted. The jury found defendant guilty as charged and found all the murder counts, as well as the robbery counts, to be in the first degree. The jury fixed the penalty as death on each of the murder counts. This appeal is automatic. (Pen. Code, § 1239, subd. (b).)

Viewed in the light most favorable to the People (*People* v. *Sweeney*, 55 Cal.2d 27, 33 [1] [9 Cal.Rptr. 793, 357 P.2d 1049]), the record shows, as follows: On Thursday, January 16, 1969, about 10:45 p.m.,

Fred Genchi, the manager of Genchi's Liquor at 5454 East Washington Boulevard in the City of Commerce, was in the back room of the liquor store directly behind a one-way mirror, through which he could look into the general store area. David Munoz, an employee, was in the store behind the counter. Genchi heard a popping noise and a sound like the crashing of glass. He looked up and observed a male Negro, wearing a gold sweater and contrasting pants, in front of the counter. He did not see the man's face, as the man had taken a step back and was turning away from him. After the man left, Genchi went into the store area and saw Munoz on the floor, gasping and covered with blood. He had been shot between the eyes. The cash register was open and contained no currency. Shortly before, there had been around $3,000 in it. Munoz subsequently died.

Genchi's Liquor is located near Certified Grocers, a wholesale grocery business where defendant worked for a few weeks in December 1968. The employees in the department in which defendant worked were paid Thursday evenings around 10 p.m. and were given a break about 11 p.m. Many cashed their pay checks at Genchi's Liquor during the break, and large amounts of cash were therefore kept on hand at that time.

Genchi called the police immediately after discovering the shooting. He told the investigating officers that the assailant was a male Negro with very dark complexion, approximately 30 years old, about six feet tall, and weighing around 200 pounds.[1] A .22 caliber shell casing discovered by the officers on the floor next to the edge of the counter was introduced in evidence at the trial.

Genchi testified that the gunman was about the same size and coloring as defendant and that the gold sweater introduced in evidence as People's Exhibit 26 was the same type of sweater as the man was wearing. He further identified defendant as a customer for whom the store had cashed checks; and evidence was presented that two checks of Certified Grocers payable to defendant (one dated December 10, 1968, for $107, and the other dated December 24, 1968, for $149) were cashed at Genchi's Liquor. Defendant denied being in Genchi's Liquor any time during January 1969.

In the late afternoon on January 28, 1969, defendant entered Dreskin's Liquor Store, in the 4200 block on South Western, and asked for a package of cigarettes. Samuel Hahn, a clerk at the store, gave him the

---

[1]Defendant's arrest report shows that at that time he was 32 years old, six feet two, and weighed 190 pounds.

cigarettes. Defendant then took a can of beer out of the beer case. Hahn went over near the cash register. By that time, defendant had returned to the counter and had a gun on it pointing toward Hahn. Upon demand by defendant, Hahn gave him money from a drawer in the cash register. Defendant asked him about the other money, the 20's and 10's. That currency was kept in another drawer. Although at first Hahn tried to avoid giving it to defendant, Dreskin, the owner, who was standing nearby, told him to do so; and Hahn did as he was told. Defendant went over to where O. B. Hunt, a Negro customer, was standing waiting for service, and shot him. He then walked over to Dreskin and shot him. Afterwards, he turned around and shot at Hahn; but before he did so, Hahn grabbed a steel chair and covered his head with it. The bullets struck the chair. Defendant then walked out of the store. Hunt was shot in the neck and Dreskin on the left side of his head in the area of the temple. Both of them died as a result of the gunshot wounds. Two expended shell casings found in the store, one on the day of the shootings and the other a few days later, were introduced in evidence by the People.

Hahn told the police that the gunman was a male Negro about 35 years old, approximately six feet tall, and weighing around 160 or 170 pounds. He also mentioned a mustache and said the man was wearing a black jacket. Hahn attended several lineups, but he did not identify defendant at any of them. He made a positive in-court identification, however, and testified that the gun introduced in evidence as People's Exhibit 1 was the gun in question or similar thereto.

Arthur L. Diggs, Jr., another customer in the store at the time of the shootings, testified at the preliminary hearing that defendant looked quite similar to the gunman. He had described the man to the investigating officers as a male Negro, 5 feet 11 to 11½ inches tall, weighing approximately 175 or 180 pounds, about 35 to 40 years of age. Diggs was unable to identify defendant at a lineup he attended, and at the trial he testified that defendant did not look like the man. He said, however, that defendant's physical characteristics in the form of height and weight were the same as those of the gunman in the liquor store and that the gold shirt, denoted People's Exhibit 26, appeared generally to be the same color as the one the man had on underneath his jacket. He also testified that he thought the person who did the shooting had a goatee and a slight mustache.

Christopher Giles testified that from time to time on January 28, 1969, he was at a service station about a block from Dreskin's Liquor Store. He was there constantly from about 3:30 to 7 or 8 p.m. He saw defend-

ant there around 3:30 that day. Defendant left about half an hour later, and an hour or 45 minutes afterwards Giles heard police sirens and a helicopter. The sirens appeared to cut off in the neighborhood of Dreskin's Liquor Store. After defendant left the service station, Giles did not see him again that evening. Giles further testified that another man at the service station, a Mr. Cranon, left after the police sirens were heard and later returned, reporting that he had heard that two people had been shot at the liquor store. Giles said that defendant was not there at the time Cranon returned.

Defendant testified that he and Cranon had arrived at the service station together about 1:30 or 2 p.m.; that he went to the liquor store half an hour later, but, after making some purchases, returned to the service station in five minutes; that he had on a brown jacket; that later Cranon went to the liquor store, and, when he returned a few minutes before 5 p.m., reported that there were "people laying all over the place" at the liquor store; that he heard sirens, but was not sure if they had sounded about the time Cranon returned or afterwards; and that about 5:15 or 5:20 p.m. he went home.

On Wednesday, January 29, 1969, defendant, according to his testimony, entered Rosie's Cafe in the vicinity of Vermont Avenue and Jefferson Street at a quarter to five in the afternoon. He spoke with someone there whom he knew from the union hall, had dinner, and then left around 10 minutes past six.

George Richardson, 16 years of age, testified that he went to Rosie's Cafe for a hamburger around 20 minutes to six that day and stayed about 15 minutes. While there, he saw defendant in the cafe. Defendant was still there when he left. About five minutes after six, he passed the cafe and happened to notice that the person to whom defendant had been talking was not there, and he did not remember that there was anyone there then besides defendant and the owners (an Oriental couple by the name of De Vinna). He testified that defendant at that time had a little goatee. He also stated that defendant was wearing a black three-quarter length leather jacket similar to People's Exhibit 51.

Mrs. Elzora Harris testified that she was waiting for a bus about 6:15 p.m. January 29, 1969, in the vicinity of Vermont and Jefferson. She heard three shots and then a pause and two more shots. They appeared to be coming either from a driveway or Rosie's Cafe. Shortly afterwards, Mrs. Harris saw defendant come out of the cafe and walk toward Vermont Avenue. He raised his leather jacket and stuck a pistol either in his right pocket or in the right side of his belt. Mrs. Harris stated that she was

within a foot or two of defendant and noticed that he was wearing a mustache; that defendant commented to a man standing near her that perhaps they could walk on home before the bus came; and that they walked west up Jefferson toward Normandie.[2] Mrs. Harris then went over to the cafe and saw two Oriental people inside who appeared to have been injured. She did not see anyone else inside.

Police officers arrived around 6:30 p.m. and discovered the De Vinnas' bodies near the counter. Mr. De Vinna had a bullet wound about the middle of his forehead, and there was a bullet wound in Mrs. De Vinna's facial area near her cheek. Both of them died as a result of the wounds.

When questioned by the police following the shootings, Mrs. Harris described the man she had seen coming out of the cafe as a male Negro between 25 and 27 years of age, about six feet tall, weighing 130 pounds, with high hair in front, and wearing a three-quarter length black leather jacket and either black or blue pants. Mrs. Harris attended a lineup about March 1, 1969, but was unable to identify defendant. She made a positive in-court identification, and testified that the lights at the lineup were brighter than the lights in the courtroom and had made defendant's dark skin appear lighter and that under the lighting conditions in the courtroom he appeared to have the same coloration she had noticed when he was coming out of Rosie's Cafe. Mrs. Harris testified that the jacket defendant was wearing was similar to People's Exhibit 51.

At the time the investigating officers entered the cafe, the cash register was open. Except for some change, it was empty. One of the officers found three expended cartridges or casings, one near the door jamb and the other two between some stools. Another casing was discovered the following day, and all four were introduced in evidence by the People.

Defendant testified that he did not shoot Mr. or Mrs. De Vinna. He said that after leaving the cafe he walked home, arriving there about 6:30 p.m., and later that evening played volleyball at a public playground.

Harry Gefter, the owner of the Cracker Box Market at 2921 South Flower Street, testified that while he and his wife were at the counter February 1, 1969, about 6:15 p.m., defendant entered the market. Defendant came over to the counter to be checked out, carrying some cigarettes and candy. He opened his jacket, and there was a gun protruding from the waistband of his pants. He told Gefter to open the cash

---

[2]There was evidence that defendant's home was seven-tenths of a mile from Rosie's Cafe and that a person walking westbound on Jefferson from the cafe would be walking in the direction of defendant's home.

register, take all the money out, and put it in a bag. Gefter did so. By this time, defendant had the gun in his hand. He turned to Mrs. Gefter and told her that she was lucky. As defendant, in leaving, approached the door, he told Gefter not to follow him or he would shoot. Thereafter, Gefter called the police.

Gefter testified that the gun which defendant pointed at him was the same gun as People's Exhibit 1 or similar thereto. Gefter recalled a scar on defendant's face at the time of the robbery and said that it was the same scar as appeared on the right side of defendant's face at the time of trial. When the police came to investigate the crime the evening it occurred, Gefter told them about the scar and mentioned that defendant was wearing a bluish jacket, which had a knitted collar. He described the robber as a male Negro about 32 years old, weighing around 190 pounds, and about six feet two inches tall. Gefter attended a lineup and identified defendant.[3]

Defendant testified that he did not know where he was on Saturday, February 1, 1969, around 6:15 p.m., but that he was not familiar with the Cracker Box Market at 2921 South Flower Street and had never been in it.

On February 8, 1969, about 9:10 p.m., Mary Graham, a clerk employed at Boys Market No. 5, 3617 Crenshaw Boulevard, saw defendant at her check stand as she was checking groceries. Defendant paid for some groceries and then said he wanted something else. He asked Mrs. Graham for six packages of cigarettes, including Pall Mall Gold, which she did not have at her check stand. She sent the box boy to obtain the ones she did not have. As she was about to give defendant the ones she had at her check stand, he had a gun pointed at her. It was similar to People's Exhibit 1. Defendant said, "This is it." Mrs. Graham stepped back, as if to indicate to him that he should take it. Defendant said, "Woman, I'll shoot you." She then stepped back to the check stand

---

[3]Gefter testified that he identified defendant from his features, but that he told the police conducting the lineup that he would like to hear the voice to see if he could identify it. Each man in the lineup was required to say, "You're lucky." Gefter identified defendant on the basis of his voice, too. He was then asked to fill out a form, and in the space provided for "Notes" the police officer asked that he write upon what he based his identification. He wrote that he identified the suspect's voice, No. 4. (Defendant was No. 4 in the lineup.) At the trial, he testified that he first made the identification on the basis of defendant's features and then additionally on the basis of his voice and that the reason he referred on the form only to the voice was that "we were just talking in regards of that voice, and that's the only reason I marked down the voice." He reiterated, however, that his identification was on the basis of defendant's complete features and his height and body.

and asked what he wanted her to do. He told her to put the money in the bag. She thereupon took some money out of the cash register and slowly put it in the bag, thinking that the security guards who were in the snack bar, would see her. Defendant told her to hurry up and said he would shoot her. She estimated that she dropped around $200 in the bag. Defendant then left, saying not to follow him or he would shoot her. Mrs. Graham testified that at the time of the robbery she noticed only defendant's face and noted a discoloration of his lips. She said that his whole face appeared the same to her in court as it had the night of the robbery.

Defendant testified that he had been to the Boys Market on South Crenshaw several years ago; he thought it was about a mile from his home on West 35th Street. He said that he did not recall Saturday, February 8, 1969, but that he did not commit a robbery at the Boys Market about 9:10 p.m. that day and had never robbed the market.

Defendant testified that on February 26, 1969, he went by bus to San Diego, where he had friends from his Navy days. He said that he had about $106 with him, the remainder of $160 which his wife had taken out of the bank and given him to join a union.

About 12:05 a.m. on February 28, 1969, Donald Abbott, a police officer for the City of San Diego, went to the Crossroads Bar at Fourth and Market Streets in response to a radio call that a man armed with a gun was at the bar. As the officer approached, he saw defendant, who appeared to be leaving the bar. The officer asked him if he had any identification, and defendant replied negatively. The officer started to give defendant a pat-down search for weapons. In the waistband area on defendant's left side, the officer felt a large metal object. He lifted defendant's jacket and saw the rear of what appeared to be a gun. He removed the gun, which was a .22 automatic pistol, denoted People's Exhibit 1. After finding the weapon, Officer Abbott placed defendant under arrest for carrying a concealed weapon and advised him of his constitutional rights. Defendant gave his address as 2572 Island Street in San Diego.[4] He said that he carried the gun to keep himself out of trouble and that it belonged to a friend named George.

Prior to giving the testimony summarized above, Officer Abbott was examined on *voir dire,* outside the presence of the jury, relative to the

---

[4]Later investigation revealed that the address was a vacant lot.

admissibility of defendant's statements to him, and the trial court ruled they were admissible.[5]

About 10 a.m., Donald Smith, a police officer for the City of San Diego, had a conversation with defendant after first advising him of his constitutional rights. Defendant appeared to be alert and responsive, and his statements appeared to be free and voluntary, without any threat of punishment or promise of reward. He said that he had been living in San Diego since August 1968 with a Dolores Walker at 2572 Island Street; that he was working during that time for a J. J. Howard, Contractor; that earlier he had owned a .32 automatic, which had been stolen from him; and that about three weeks before his arrest he had purchased the gun which he had on him when arrested from a man by the name of Charles at a pool hall on the avenue.[6] Defendant mentioned that since August he had made occasional trips to Los Angeles.

Around lunch time on February 28, 1969, Sergeants Kenneth Matthys and Laurence Massaro, of the Los Angeles Police Department, and Sergeant Edward Franzese, of the Los Angeles County Sheriff's Department, arrived in San Diego. Matthys and Massaro interviewed defendant briefly at the San Diego police station some time during the middle of the day. A court order was obtained for defendant's release from the jail in San Diego, and on the evening of February 28, 1969, he was transported by Matthys and Massaro from San Diego to the Los Angeles Police Department's University Station.

Around 10 p.m., February 28, 1969, Sergeant Donald Cannon, of the Los Angeles Sheriff's Department, had a conversation with defendant at University Station. Sergeant Franzese was also present at the initial

---

[5]Among other things, Officer Abbott testified that he told defendant that he had a right to remain silent then or at any time, that anything he said would be used against him in court, that he had the right to an attorney then or any time during the interrogation, and that if he could not afford one, the city would provide one for him free of charge. He asked defendant if he understood these rights, and defendant said yes. He asked if defendant was willing to talk with him, and defendant said yes. He also said that defendant had a slight odor of alcohol on his breath, but was in total control of his faculties, appeared rational and coherent, and seemed to walk in a normal manner.

Defendant testified that Officer Abbott told him he had a right to an attorney and could remain silent, but that the officer did not tell him anything else. He later said that the officer may have said he could have an attorney free of charge, but that he did not recall it. Defendant denied having said that the gun belonged to anyone named George and claimed he told the officer he owned it himself and had bought it from someone named George.

[6]"On the avenue" denoted one of two streets in San Diego, either Imperial Avenue or Fifth Street, in the downtown area, where there were many pool halls.

conversation. Before any evidence was received with respect to what was said during the conversation, extensive *voir dire* proceedings were had, outside the presence of the jury, to determine whether there was a free and intelligent waiver of counsel by defendant and whether his statement was voluntary. The trial court ruled that there was such a waiver and that defendant's statement was voluntary.[7]

In the conversation with Sergeant Cannon, defendant said that he lived in the Los Angeles area; that he went to San Diego February 25· on a bus; that he was armed; that he spent the night with a girl named Marie in a hotel room, but he did not know exactly where or the name of the hotel; and that he went to a number of bars in the San Diego area the night of the 26th and was arrested the morning of the 27th for possession of the gun which he had.

Defendant acknowledged that he was familiar with the East Los Angeles area and stated that he had worked for Certified Grocers in December 1968 and had cashed checks on Thursday nights at Genchi's Liquor Store near Certified Grocers. He told Sergeant Cannon that he had bought the gun denoted People's Exhibit 1 the first week in February from a person named Maurice in a pool hall at 39th and Western, paying $10 for it; that he had not used the name of George or Charles as the name of the person from whom he had purchased the gun; that he was familiar with Rosie's Cafe and had been there the night the man and woman of Japanese descent were killed, and had been there that morning, too; that he left the cafe between approximately 6:10 and 6:15 p.m.; that he had a .32 caliber automatic in his waistband, which weapon had since been stolen; that there were two people in the cafe other than the owners, and one of them was Eddie; that the person other than Eddie left; that he and Eddie then left together, and at that time there was no one else in the cafe other than the owners; that he and Eddie walked westbound

---

[7]The trial court found that defendant was properly advised of his constitutional rights by Sergeant Cannon (under *Miranda* v. *Arizona,* 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]), understood them, and waived them knowingly, intelligently, and voluntarily; that there was no refusal or expressed reluctance of defendant to talk with the officers or a request by defendant for an attorney at any time before or during the statements; that defendant was not under duress; that there was no threat other than a statement to the effect that an officer was armed and would shoot if defendant attempted to escape, but that this was not such threat as caused him to feel any duress; that there was no promise of reward or favor or discussion of a possible reduction to a lesser degree or offense; that the period of questioning was not unreasonable, and defendant was granted the opportunity to make a telephone call or calls but chose not to do so; and that there was no violation of defendant's right to have an attorney present relative to a San Diego attorney appointed in an arraignment previously and nothing to disclose that the officers knew, or should have known, that defendant had an attorney.

on Jefferson to Vermont, where they separated; and that he continued west on Jefferson to a baseball game.

While Sergeant Cannon was interviewing defendant, Sergeants Matthys and Massaro went to defendant's residence at 1462 West 35th Street. They returned later with a black leather jacket (introduced in evidence at the trial as People's Exhibit 51). The jacket was exhibited to defendant while he was still being interviewed by Cannon. Cannon asked defendant if he had any medical problems. Defendant explained that he had epilepsy. He did not, however, at that time indicate that a seizure was coming on or that he felt any symptoms of epilepsy.

After Sergeant Cannon talked with defendant, Sergeants Matthys, Massaro, and Franzese took defendant to the area of Dreskin's Liquor Store. Matthys asked defendant if he had ever been in the store, and defendant said he had been there several times.

*Hearing on Motion to Suppress Evidence*

Prior to the selection of the jury, the trial court heard a motion to suppress, pursuant to section 1538.5 of the Penal Code. Suppression of the following items was asked: The .22 caliber automatic pistol allegedly obtained from defendant in San Diego by Officer Abbott, and any other items then obtained; the three-quarter length black leather coat allegedly obtained from 1462 West 35th Street, Los Angeles, on February 28, 1969, by officers; the gold sweater shirt allegedly obtained in a search of 1462 West 35th Street on or about March 1, 1969, by officers; and any other items obtained there on that date by the officers. It was stipulated, in respect to any of the items, that at the time of their acquisition there was no search warrant or warrant for defendant's arrest.

At the hearing on the motion, Officer Abbott testified, among other things, that the radio call to check a man carrying a gun indicated that the man was wearing a green shirt and a brown jacket; that he arrived at the area of the bar within two minutes after receiving the call; that as he was proceeding across the intersection at the bar he saw a man in a green shirt and brown jacket (defendant) leaving the front door of the bar; that he went to the front door, and a man met him and said that the person going down the street (defendant) was the man with the gun; that after discovering the gun on defendant's person in a pat-down of his pockets, he arrested defendant for carrying a concealed weapon and told him that he had a right to remain silent then or at any time, that anything he said could be used against him in court, that he had the right to an attorney then or any time during the interrogation, and that if he could

not afford one, the city would provide one for him free of charge; that he asked defendant if he understood these rights, and defendant said yes; and that he asked if defendant was willing to talk with him, and defendant said yes.

Sergeant Matthys testified that the gun removed from defendant's person was test-fired in his (Sergeant Matthys') presence in San Diego; that Sergeant Franzese took the casings from the test-firing back to Los Angeles, to be matched against shell casings which had been taken from the scenes of the crimes hereinabove related; that Franzese later called and told him there was a positive match on the test casings; that when he and Sergeant Massaro saw defendant at the San Diego police station, they told defendant that they were there to interview him concerning several murders in Los Angeles and had reason to believe he might possibly have committed them; that he asked defendant then if he had been advised of his rights by the San Diego Police Department, and defendant said yes; that he asked defendant if he understood that they were investigating officers, if he knew that he had a right not to tell anything, if he knew that he had the right to have an attorney present, if he knew that he could remain silent, and if he knew that anything he said could be used against him in court; and that defendant said that he wanted to talk with them, that he had never hurt anyone in his life, and that he certainly would never commit a murder. Matthys said that he could not recall whether or not he had said at that time that an attorney would be appointed free of charge if desired. Some time during the conversation, defendant was asked if he had a black, three-quarter length jacket; and Matthys testified that, as he recalled, defendant said he did own a black leather jacket.

Sergeant Matthys further testified that when he and Sergeant Massaro went to defendant's residence at 1462 West 35th Street while Sergeant Cannon was interviewing defendant, their purpose was to obtain the black leather jacket which defendant purportedly owned; that they knocked on the door and were admitted by defendant's wife; that she was there alone with two children; that they asked her if she knew where defendant was at that time, and she said she did not; that they told her he had been arrested but they were not at liberty to tell her then exactly what he had been arrested for; that they had been advised he had a black leather jacket possibly at that location, and they asked her if she knew about it; that she said yes, she thought defendant owned a jacket of that description; that they asked her if she would get it for them; that she said she would look for it and see if she could find it; that she then got a jacket from a bedroom in the front part of the house and gave it to him; and that they

talked with her for a while about defendant's being in jail and under arrest and then left.

Sergeant Matthys also testified that the next afternoon he returned to defendant's residence, accompanied by Sergeant Cannon; that they went there to obtain a yellow, turtleneck shirt type of clothing; that on their arrival they were admitted by defendant's wife; that he told her what they were looking for and said they were prepared to proceed with getting a search warrant for the shirt they were looking for, but that if she would get the shirt for them, they would not need to go through the procedure and would not have to disturb the rest of her house; that she then went to a service porch door on the southeast corner of the house and obtained the shirt; that she gave it to them; that he thanked her for getting the shirt and told her that he was glad she did not make it necessary for them to obtain a search warrant for it; and that while they were there, he told defendant's wife that defendant had been arrested for murder. Sergeant Matthys further testified that, while there, he recorded on a sheet of paper, marked People's Special 1, the substance of the conversation the officers had with defendant's wife and told her to read it; that he also read it to her; and that after he read it to her, she signed it.

Defendant's wife, called as a witness in his behalf, testified that when Sergeant Matthys and his partner came by her home at 12 or 12:30 Friday night, they told her they were police officers, and she let them in; that the officers first asked if defendant had a brown leather jacket; that after she said no, they asked if he had a leather jacket of any kind; that she told them he had received a black one for Christmas; that she gave it to Sergeant Matthys; that when the officers came by the next day, they wanted to know if defendant had a gold sweater; that when she said he did not, they asked if he had a gold shirt of any type, and she said that he did; that Sergeant Matthys said they could be out in five minutes with a search warrant and tear the house up and take her and the children downtown for questioning; that he said there would be reporters if they got a search warrant; and that she went and got the shirt for them.

Sergeant Matthys denied stating anything to defendant's wife to the effect that it might be necessary to take her and the children to the police department for questioning or that her house would be torn up if it was necessary to secure a search warrant. He said he told her that things would probably be disturbed in the house if they had to look through it, and he admitted that something may have been said as to reporters' coming there, but he did not know what. He testified that he had no conversation with defendant's wife as to her children other than a friendly conversation.

Defendant introduced in evidence a docket sheet of the Municipal Court for the San Diego Judicial District, showing that on February 28, 1969, prior to his release from the jail, a complaint charging him with a felony had been filed against him, an arraignment had taken place, and an attorney had been appointed to represent him. The deputy district attorney called the court's attention to the fact that the charge in San Diego was "ex-con with a gun" and was entirely unrelated to the charges on which defendant was to be tried herein.

Following the close of testimony on the motion to suppress, the trial court found, as to the pistol, that defendant's detention by Officer Abbott was reasonable, the officer having had more than a mere hunch; that the bartender who informed Officer Abbott that defendant was the person who had a gun was not an ordinary police informant but was a citizen informant, and the officer had cause to believe that what was being stated was correct; that the cursory search was reasonable; and that the pistol was procured legally by the officer. As to the coat and sweater or shirt, the trial court found that they were not procured as a result of an illegal search or seizure; that defendant's wife delivered them to the officers freely and voluntarily; that the information which the police department received as to the existence of these items was not in violation of defendant's rights; and that the items were not procured in violation of his rights. The trial court found, further, that there was insufficient evidence to indicate that any of the officers of the Los Angeles or San Diego Police Department knew that defendant had counsel appointed for him at the time Officer Matthys discussed the leather jacket with defendant; that defendant was properly advised of his *Miranda* rights by Officer Abbott; and that the advisement by Officer Matthys was not complete, but since defendant had previously been advised, it was unnecessary to advise him again. The trial court found, in summary, that the procurement of the black leather coat and the turtleneck sweater or sport shirt was not the fruit of anything of an illegal nature done by the officers in San Diego or elsewhere. The motion to suppress was denied as to all items.

*Nature of the Defense*

Defendant took the stand in his own defense and, as hereinabove indicated, denied being at the scenes of the crimes and denied committing the crimes. He further testified, among other things, that there was some discoloration on his lower lip; that he had had some scars on the right side of his face since 1958; that his mustache the day he was testifying was much the same as in January and February 1969; that his sideburns were in the same condition as in January and February 1969; that they were no longer or bushier then (as several of the prosecution witnesses

had testified); and that he had had a small beard the previous summer, but had shaved it off.

Defendant admitted that when he told the San Diego police officers that he had purchased the gun in San Diego, he was lying; and he admitted that he was not living on Island Avenue in San Diego, as he had told the officers he was. He denied telling Sergeant Cannon that he was armed at the time he was in Rosie's Cafe. He said that he had asked to be allowed to call his wife right after he arrived at the University Station, but was denied permission. He testified that before they left the station, Sergeant Cannon said he would not last 10 minutes out with his own kind and that Sergeant Matthys, taking a gun out and holding it in his hand, said they just ought to shoot him. Defendant said that he was afraid and that he was inter- rogated against his will. He also stated that after he was booked about 12 o'clock the night he was brought back to Los Angeles, he did not renew his request to make the telephone call, because he wanted to rest instead. He said that although he was not ill, he could, as he told Sergeant Matthys, feel a seizure coming on and that he did have a seizure during the night after he went to sleep in his cell.

Defendant's wife testified in his behalf. She said that defendant did not have long or bushy sideburns in 1968 or 1969; that he had had noticeable scars on the right side of his face for some time; that the jacket denoted People's Exhibit 51 was a Christmas present to defendant; that the gold shirt denoted People's Exhibit 26 belonged to him, and she had given it to some police officers; that defendant was employed by Certified Grocers in December 1968, but ceased to be employed during that month because he was hurt on the job; that she did not think he was employed in January 1969; that he worked for a construction company in February; that her family was not in need of money during January or February; that she was employed at the time, and her approximate income was $460 a month; that defendant usually played ball on Thursday nights, and she assumed he was going to play ball on January 16, 1969, but that she did not specifically remember that day; that she would not be able to tell where defendant was on January 28 or 29 or February 8 or 25; and that during January and February defendant did not own an automobile or have the use of one to her knowledge.

Defendant's wife acknowledged that the statement purportedly taken from her by Officer Matthys on March 1, 1969, bore her signature; but she denied that she had read the statement or had it read to her. She then specifically denied that she had made certain statements contained therein, that is, that defendant had not worked since the middle of December, that

he gave her $100 on a Friday in the middle of January; that he gave her $50 on Tuesday, February 25, 1969, before leaving for San Diego; and that when he left for San Diego, he had about $100 or $150 on him, and she did not know where the money came from.

Several witnesses testified in support of defendant's alibi that he was at the service station near Dreskin's Liquor Store at the time of the killings there. The boxboy at Boys Market testified that he could not identify defendant as either being, or not being, the robber. Other witnesses testified that defendant was known to them as a peaceful, gentle person, whom they had never seen excited or angry.

Defendant contends that the trial court, on its own motion, should have given instructions on diminished capacity and unconsciousness; but there is no merit to this contention. ■ Where substantial evidence sufficient to inform the trial court that a defendant is relying on the defense of diminished responsibility is received, the court must, on its own motion, instruct the jury as to the legal sufficiency of such evidence. (*People* v. *Henderson,* 60 Cal.2d 482, 491 [35 Cal.Rptr. 77, 386 P.2d 677].) ■ In the present case, however, there was no substantial evidence sufficient to inform the trial court that defendant was relying on such defense. His own testimony shows that although he suffered from epilepsy, he had not been bothered by it for two or three months before he was arrested. He testified that *after* the interrogation the night of February 28, 1969, he felt a seizure coming on and had one some time that night, but that the last time he had had a seizure before this particular one was two or three months before, and that he did not recall any in January 1969. Accordingly, there being no evidence during the guilt phase that defendant had a seizure during the period of time when the charged offenses took place, there was no evidence entitling him to rely on the defense. (See *People* v. *Lookadoo,* 66 Cal.2d 307, 316 [57 Cal.Rptr. 608, 425 P.2d 208].)

■ Defendant further contends that the trial court erred in refusing to give instructions on second degree murder or manslaughter, but we have concluded that the refusal to give the requested instructions was proper.

In *People* v. *Lloyd,* 98 Cal.App.2d 305, 311 [220 P.2d 10], it was said: "The facts established by the prosecution witnesses prove nothing short of murder in the first degree. Since appellant denied *in toto* such testimony, denied his presence on the premises of the deceased on the night of the murder, why should the court have confused the sole issue of murder in the first degree with instructions concerning, and definitions of, crimes included in the crime charged? In charging a jury, the court should be guided by the facts proved. When a person is accused of murder

in the first degree, if the evidence is of such nature as to warrant a verdict for no lesser crime, if the defendant is guilty at all, the court should refuse to instruct as to crimes included within first degree murder." (See also *People* v. *Mabry,* 71 Cal.2d 430, 437-438 [78 Cal.Rptr. 655, 455 P.2d 759].)

In refusing to instruct on lesser crimes included in first degree murder, the trial judge stated: "It is the Court's view of the evidence that Murder 2nd instructions should not be given in this case. The Court believes that in view of the defendant's claim of alibi as to each of these counts of murder, and in view of the fact that the evidence is substantial that there was a robbery in each case, and there being nothing to indicate to the Court that a Murder 2nd instruction would be proper under the evidence, the Court therefore is going to give just the instructions on felony murder, robbery, and that alone.

". . . . . . . . . . . . . .

"It seems to me to be common sense in each case that this is either a felony murder or it results in acquittal of the defendant, based on his claim of not having been involved."

Under the circumstances, the trial judge's analysis was entirely correct.

■ Defendant contends that he was not properly advised of his constitutional rights; that his right to counsel and his right to remain silent were violated; and that, as a result, his statements to the officers and the gun and items of clothing obtained by them were inadmissible. He further argues that, in determining whether there has been a waiver of fundamental constitutional rights, this court should not be required to view the evidence on the basis most consistent with a waiver.

■ The burden of establishing a waiver of the right to counsel and the right to remain silent is on the prosecution (*People* v. *Kelley,* 66 Cal.2d 232, 247 [17] [57 Cal.Rptr. 363, 424 P.2d 947]; *People* v. *Furnish,* 63 Cal.2d 511, 517 [5] [47 Cal.Rptr. 387, 407 P.2d 299]; *People* v. *Lilliock,* 62 Cal.2d 618, 621-622 [2] [43 Cal.Rptr. 699, 401 P.2d 4]); and the courts will not lightly find that there has been a waiver of a fundamental constitutional right, but, rather, will indulge in every reasonable presumption against a waiver (*In re Fresquez,* 67 Cal.2d 626, 629 [2] [63 Cal.Rptr. 271, 432 P.2d 959]; *People* v. *Carter,* 66 Cal.2d 666, 669 [58 Cal.Rptr. 614, 427 P.2d 214]; *People* v. *Douglas,* 61 Cal.2d 430, 434 [38 Cal.Rptr. 884, 392 P.2d 964]). On appeal, however, the burden is on the defendant to establish that he did not competently and intelligently waive the right. (*People* v. *Hill,* 70 Cal.2d 678, 688-689 [2] [76 Cal.Rptr. 225, 452 P.2d

329]; *People* v. *Armstrong*, 274 Cal.App.2d 297, 305 [5b] [79 Cal.Rptr. 223]; *People* v. *Kranhouse*, 265 Cal.App.2d 440, 447 [3] [71 Cal.Rptr. 223].)

Where there is no conflict in the evidence, there is no requirement that the reviewing court view it in the light most favorable to upholding the trial court's determination. (See *Badillo* v. *Superior Court*, 46 Cal.2d 269 [294 P.2d 23]; *People* v. *Superior Court*, 3 Cal.App.3d 476, 488 (13) [83 Cal.Rptr. 771]; *People* v. *Russell*, 259 Cal.App.2d 637, 645 [6, 7] [66 Cal.Rptr. 594].) But where, as here, there is a conflict in the evidence, it is the duty of the reviewing court to determine if there is substantial evidence in the record to uphold the finding of the trial court, and the trial court's ruling will not be disturbed on appeal unless it is palpably erroneous. (*People* v. *Floyd*, 1 Cal.3d 694, 702-703 (2) [83 Cal.Rptr. 608, 464 P.2d 64]; *People* v. *Duran*, 269 Cal.App.2d 112, 116 [1] [74 Cal.Rptr. 459]; *People* v. *Midkiff*, 262 Cal.App.2d 734, 739 [2] [68 Cal.Rptr. 866].)

As stated in *People* v. *Debnam*, 261 Cal.App.2d 206, 212 [8] [67 Cal.Rptr. 692]: "The question whether an accused waived his right to counsel and his right to remain silent before making a statement to police officers is primarily a question of fact for the trial judge." Likewise, in *People* v. *Drumgo*, 269 Cal.App.2d 479, 482 [3] [74 Cal.Rptr. 761], it was said: "The court in this case observed the witness (appellant), heard him testify, heard and saw the officers testify with reference to whether appellant made an intelligent waiver of his privileges and rights. It is a question of fact and the judge is the person under the circumstances in this case to ascertain the credibility of the witnesses."

In *People* v. *Brockman*, 2 Cal.App.3d 1002, 1008 (6, 7) [83 Cal.Rptr. 70], the Court of Appeal correctly pointed out: "In determining whether there has been a waiver of constitutional rights, the issue must be resolved on the whole record [citations], and its resolution must depend upon the particular facts and circumstances surrounding the case under considera-tion, including the background, experience, and conduct of the accused. [Citation.] The attendant facts must, therefore, show clearly and convinc-ingly that the accused did relinquish his rights knowingly, intelligently and voluntarily [citation], and the burden of making such a showing is upon the prosecution. [Citations.] Procedurally, the determination of this issue is primarily a question for the trial judge, and his determination will not be disturbed by an appellate court unless, in the light of the applicable principles, it is palpably erroneous."

█ With respect to the trial court's receiving in evidence the gun and the clothing sought to be suppressed under defendant's motion to suppress (Pen. Code, § 1538.5), the following statement from *People v. Superior Court, supra,* 3 Cal.App.3d 476, 488 (13), is apropos: " 'A proceeding under section 1538.5 to suppress evidence is one in which a full hearing is held on the issues before the superior court sitting as a finder of fact.' [Citations.] Accordingly, the duty of determining questions of fact in such a proceeding is for the trial court and its rulings will not be disturbed on appeal if the trial court had before it substantial evidence justifying the rulings. [Citation.] This rule, however, is not applicable in cases involving searches and seizures in which the facts bearing on the legality of the search are undisputed and establish as a matter of law that the evidence is or is not admissible." (See also *People* v. *Superior Court,* 9 Cal.App.3d 203, 209 (4) [88 Cal.Rptr. 21].)

In *People* v. *Atkins,* 10 Cal.App.3d 1042, 1047-1048 (5) [89 Cal. Rptr. 588], the Court of Appeal, recognizing the trial court's power to pass on the credibility of witnesses testifying with respect to an alleged waiver of a constitutional right, said: "Although *Miranda* states that 'any evidence that the accused was threatened, tricked, or cajoled into a waiver will, of course, show that the defendant did not voluntarily waive his privilege' (384 U.S. at p. 476 [16 L.Ed.2d at p. 725]), we understand the court to mean by that: *any evidence believed by the trial court.* No other interpretation would be practicable."

In the present case, the version of events adopted by the trial judge on conflicting evidence was a reasonable one and amply warranted the findings made; and the California procedure hereinabove discussed strikes an appropriate balance between pragmatism on the one hand and adequacy on the other.

█ Defendant next contends that the gun, taken from his person in San Diego, was the product of an illegal search and seizure and was therefore inadmissible. The record shows, however, and the trial court found, that the gun was taken in a pat-down search properly conducted following a justifiable detention. (See *Cunha* v. *Superior Court,* 2 Cal.3d 352, 355-356 [85 Cal.Rptr. 160, 466 P.2d 704]; *People* v. *Davis,* 260 Cal.App.2d 186, 188-189 [67 Cal.Rptr. 54].)

The record shows that the police received a telephone call that a man dressed in a green shirt and a brown jacket was at a certain bar with a gun. Officer Abbott arrived at the bar within two minutes. He saw defendant, dressed in a green shirt and a brown jacket, leaving the front door of the bar. As the officer approached the front door, a man met

him, pointed to defendant, and informed the officer that defendant was the man with the gun. The man who pointed defendant out to the police was the bartender, and it was he who had notified the police of defendant's presence at the bar with a gun.

The police properly acted on the information given to them by the bartender. Thus, in *People* v. *Gardner*, 252 Cal.App.2d 320, 324-325 [7] [60 Cal.Rptr. 321], it was said: "In dealing with the problem of informants whose information may or may not be sufficient to create probable cause, it should be noted that a citizen who purports to be the victim of or to have witnessed a crime is a reliable informant even though his reliability has not theretofore been proven or tested. [Citations.] The rationale underlying this principle is that such person is 'more than a mere informer. He is an observer of criminal activity, who by calling the police, acts openly in aid of law enforcement.' [Citation.] Accordingly, a number of cases have held that it is reasonable for police officers to act upon the reports of such observers."

Likewise, in *People* v. *Lewis*, 240 Cal.App.2d 546, 549-551 [49 Cal.Rptr. 579], it is pointed out that although with respect to bookmaking and narcotics offenses it must be shown, before the police may act on information given to them by an informant, that the informant is "reliable," the police are not required, before acting on information supplied by a citizen who has witnessed a crime, to investigate the background, character, or mental capacity of the person giving the information. (See also *People* v. *Wade*, 265 Cal.App.2d 35, 39 [71 Cal.Rptr. 108]; *People* v. *Guidry*, 262 Cal.App.2d 495, 497-498 [68 Cal.Rptr. 794].)

█ In questioning the admissibility of his clothing (the jacket and the sweater-shirt) into evidence, defendant refers to their procurement as premised on a consent to a search which produced it. However, as shown by the record, the officers did not seize the items as the result of any search; rather, as to each item, defendant's wife went to a location in the house, obtained it, and gave it to the officers. Under the circumstances, the issue is not how the facts should be evaluated to determine whether there was a valid consent to a search, obviating the necessity for a search warrant, but, instead, how they should be weighed to determine whether defendant's wife acted voluntarily in turning the items over to the officers. (See *United States* v. *Retolaza* (4th Cir. 1968) 398 F.2d 235 (cert. den. 393 U.S. 1032 [21 L.Ed.2d 576, 89 S.Ct. 646]).)

As hereinabove indicated, where there is a conflict in the evidence we must determine if there is substantial evidence in the record to uphold the finding of the trial court, and the trial court's ruling will not be

disturbed on appeal unless it is palpably erroneous. Clearly, there is substantial evidence to support the trial court's finding here that defendant's wife, without any coercion on the part of the police, voluntarily turned the clothing over to the officers.

On the assumption that in procuring the clothing the officers conducted a search, defendant argues that where an accused is in custody, he should be entitled to have a magistrate determine if there is reasonable cause to search his home, particularly when the search is to be conducted at night. He further contends that his wife could not validly consent to a search of the home. As hereinabove pointed out, however, no search took place. In any event, since a wife normally exercises as much control over the property in the home as the husband, police officers may reasonably assume that she can properly consent to a search thereof, and her consent obviates the necessity for a search warrant. (*In re Lessard,* 62 Cal.2d 497, 504-505 [42 Cal.Rptr. 583, 399 P.2d 39]; cf. *United States* v. *Alloway* (6th Cir. 1968) 397 F.2d 105, 109.)

 Still assuming that a search occurred, defendant further contends that in the absence of counsel his wife should have been advised that she did not need to consent to a search by the officers. Even if the procurement of the clothing is treated as having occurred in a search, there would be no merit to this contention, as California does not require a police warning as a prior condition for a valid consent to search. (*People* v. *Beal,* 268 Cal.App.2d 481, 484-485 [3] [73 Cal.Rptr. 787]; see also *People* v. *Superior Court,* 71 Cal.2d 265, 270, fn. 7 [78 Cal.Rptr. 210, 455 P.2d 146].) As stated in *Beal,* "The trial court's scrutiny of the voluntariness of the consent is far more protection to a defendant than the recital of some warning by the police." (P. 485 of 268 Cal.App.2d.)

 While defendant's wife may have been at a disadvantage psychologically, it does not appear from Officer Matthys' version of the facts that she was under arrest or threatened therewith. Accordingly, no coercion has been established, and no circumstances militate against the validity of the action of defendant's wife. (See *Coolidge* v. *New Hampshire,* 403 U.S. 443, 484-490 [29 L.Ed.2d 564, 593-596, 91 S.Ct. 2022]; *United States* v. *Retolaza, supra,* 398 F.2d 235, 238-239.)

Defendant contends that his statements received in evidence were inadmissible, because the admonitions given to him as to his constitutional rights were inadequate and because he had an attorney at the time of the alleged waiver of his rights and was interrogated outside the presence of his attorney.

The admonition given to defendant by the San Diego police was clearly adequate, and the trial court so found. The trial court found that the further admonition given defendant by the Los Angeles police officers in San Diego before they questioned him there was inadequate. Defendant does not appear to question the adequacy of the admonitions given to him following his return to Los Angeles.

Defendant argues that the admonition given to him at the time he was arrested in San Diego for carrying a concealed weapon (a misdemeanor) could not be the basis for a valid waiver of his constitutional rights later the same day with respect to a multiple murder charge. There is, however, no merit to this contention.

Before the Los Angeles police officers questioned defendant in San Diego, they asked him if the San Diego police officers had advised him of his rights, thus clearly indicating that his rights in connection with the felony charges would be the same as those in connection with the misdemeanor charge.[8] They then asked him if he understood that he had a right not to tell anything, that he could remain silent, that anything he said could be used against him in court, and that he had a right to have an attorney present. Defendant answered the officers' questions in the affirmative and told them that he wanted to talk with them and that he had never hurt anyone in his life and certainly would never commit a murder.

Defendant could not reasonably have believed that with respect to a misdemeanor charge he would have a right to remain silent, anything he said could be used against him in court, he had a right to have an attorney represent him and to have the attorney present during any interrogation, and if he could not afford to pay for an attorney, one would be provided for him free of charge, but that with respect to a *felony* charge he would have only the first three of those rights and would not be entitled to have an attorney provided for him free of charge if he could not afford to employ one. ■ Accordingly, defendant's voluntarily talking with the Los Angeles police officers after the San Diego police had advised him of his constitutional rights earlier the same day, and he acknowledged to the Los Angeles police officers that he had been so advised and that he understood his rights, clearly constitutes a waiver by defendant.

[8]To the effect that the right to counsel on a misdemeanor charge is the same as that on a felony charge see *In re Lopez,* 2 Cal.3d 141, 145-146 (1) [84 Cal.Rptr. 361, 465 P.2d 257].

 Defendant, citing *Massiah* v. *United States,* 377 U.S. 201 [12 L.Ed.2d 246, 84 S.Ct. 1199], claims that the evidence was tainted because an attorney had been appointed to represent him in San Diego on the charge of carrying a concealed weapon, and he was questioned with respect to the murder and robbery charges outside the presence of his attorney. We find, however, that under the circumstances of this case defendant's waiver of an attorney prior to making his statements was nevertheless effective.

It will be recalled that defendant was arrested in San Diego shortly after midnight on a charge of carrying a concealed weapon and was properly advised of his constitutional rights by Officer Abbott, of the San Diego police. Defendant was again advised of his rights around 10 a.m. by Officer Smith, of the San Diego police. During the afternoon, Sergeants Matthys and Massaro interviewed defendant briefly at the San Diego police station. Matthys first advised defendant of his rights, but, as hereinabove indicated, the trial court ruled that the admonition was not complete. Before speaking with defendant, Matthys had been advised by someone in the San Diego Police Department that because of the seriousness of the charges in Los Angeles, they were probably going to drop their charges; and later in the day a court order was obtained releasing defendant from the jail in San Diego for transportation to Los Angeles, where murder and robbery charges were to be made against him. The trial court found that there was insufficient evidence to show that any of the officers knew, or should have known, at the time Sergeant Matthys had his conversation with defendant at the San Diego police station, that counsel had been appointed for defendant on the San Diego charge; and since Matthys came to San Diego on the day of defendant's arrest and was informed, before talking with defendant, that the San Diego charge would probably be dropped because of the seriousness of the Los Angeles charges, it was not incumbent upon him to make specific inquiry whether or not an attorney had been appointed to represent defendant on the San Diego charge. Under all these circumstances, the fact that counsel had been appointed to represent defendant on a completely unrelated charge did not make ineffective his clear waiver of counsel. (See *People* v. *Wade,* 35 App.Div.2d 401 [317 N.Y.S.2d 122, 124].)

 Defendant urges that his statements were inadmissible on the further ground that as a matter of due process they should have been supplemented by some recorded means. An officer's testimony of what he has seen and heard, however, is admissible as primary evidence even though part of the same matter is incorporated into a sound recording. (*People* v. *Sica,* 112 Cal.App.2d 574, 587-588 [247 P.2d 72].) Accord-

ingly, an officer's testimony of a conversation with a defendant is admissible in any event; the absence of a recording or transcription would merely be one of the surrounding circumstances for the court to consider in passing on the issue.[9]

In *Lisenba* v. *California,* 314 U.S. 219, 236 [86 L.Ed. 166, 180, 62 S.Ct. 280], it was said: "As applied to a criminal trial, denial of due process is the failure to observe that fundamental fairness essential to the very concept of justice. In order to declare a denial of it we must find that the absence of that fairness fatally infected the trial; the acts complained of must be of such quality as necessarily prevents a fair trial." The omission to record a defendant's statement, however, does not amount to an act fatally infecting the trial, particularly where, as here, all the circumstances are presented for the scrutiny of the trial court.

Although there is no merit to any of defendant's contentions hereinabove discussed, there is, in view of this court's decision in *People* v. *Anderson,* 6 Cal.3d 628 [100 Cal.Rptr. 152, 493 P.2d 880], merit to his further contention that the death penalty violates our state constitutional provision against cruel or unusual, punishment. Accordingly, the judgment is modified to provide for life imprisonment and, as so modified, is affirmed.

**McCOMB, J.**—I concur in the majority opinion, except that, for the reasons expressed in my dissenting opinion in *People* v. *Anderson,* 6 Cal.3d 628, 657 [100 Cal.Rptr. 152, 493 P.2d 880], I dissent from the modification of the judgment.

---

[9]During the *voir dire* examination of Sergeant Matthys, he testified that Sergeants Cannon and Franzese, of the sheriff's department, were the ones who interviewed defendant at University Station and that they were not familiar with the tape recording machines there.