**UNITED STATES of America,** **Appellee,**

v.

**Miguel Marcelo RETOLAZA, Appellant.**

**No. 11514.**

United States Court of Appeals Fourth Circuit.

Argued Jan. 10, 1968.

Decided June 27, 1968.

Rehearing Denied July 24, 1968.

H. Thomas Howell, Baltimore, Md. (Court-appointed counsel) [Lawrence F. Naughton, and Semmes, Bowen & Semmes, Baltimore, Md., on the brief] for appellant.

Donald E. Sharpe, Asst. U. S. Atty. (Stephen H. Sachs, U. S. Atty., on the brief) for appellee.

Before BOREMAN, WINTER and BUTZNER, Circuit Judges.

WINTER, Circuit Judge:

Notwithstanding his defense of insanity, defendant was convicted on each count of a three-count indictment charging him with the robbery of a federally-insured national bank in violation of 18 U.S.C. § 2113(a), (b) and (d). From the judgment thereon, which sentenced him to serve concurrent terms, the longest of which was twenty years, he appeals.

The offense occurred March 1, 1966, and was committed by a man carrying a

gun who threatened two bank employees with bodily harm if they sounded an alarm. At trial, the two employees identified defendant as the culprit and testified that he had visited the bank on two prior occasions purportedly to negotiate a loan. Defendant was further linked with the offense through the F.B.I.'s recovery from his apartment of a portion of the stolen currency which was wrapped in identifiable bands.

 Numerous contentions are asserted on appeal. First, defendant contends that the money and a shotgun, which agents of the F.B.I. obtained from his apartment, were obtained as the result of an illegal search and seizure. Secondly, he contends that reversible error was committed when the prosecutor revealed in the presence of the jury that the two bank employees had given the government Jencks Act statements. Thirdly, he argues that the latitude given the government in cross-examining a psychiatrist who testified for defendant and in permitting rebuttal evidence on the issue of mental capacity was fatally broad. Fourthly, defendant asserts that the district judge's instructions as to insanity were erroneous. Defendant's other contentions need not detain us.[1] We find no merit in any of the grounds for reversal which are asserted, and we affirm the judgment.

We postpone further statement of the facts until consideration of the point to which they relate.

## I

The issue of the alleged illegal search and seizure was litigated in a pretrial motion to suppress, which was denied. The point was preserved at trial, and at the conclusion of all of the evidence, the motion was renewed. Again it was denied by the district judge who amplified his formal findings and conclusions at the time of original denial. Briefly stated, the district judge, after plenary hearing, found no "force, coercion, illegal entry and other alleged improper conduct" on the part of F.B.I. agents who obtained the gun and the money from defendant's apartment. The district judge specifically found the testimony of the F.B.I. agents who testified about the events of March 9 and March 10 when the alleged illegal search and seizure took place was more credible than that of defendant's wife whose testimony was relied on to establish their illegality. A short summary of these events demonstrate the correctness of these findings.

Defendant became a suspect within several days after the robbery. On March 7, defendant's 19-year-old wife was interviewed by an F.B.I. special agent in the pharmacy where she worked. She told the agent that she had last seen her husband on March 2, 1966, and she denied seeing any guns.

Two days later, the same special agent, in possession of a warrant for defendant's arrest, accompanied by two other special agents, went to see defendant's wife at a business school she was attending. He had earlier gone to defendant's

---

1. Defendant was sentenced to 20 years on the count based upon 18 U.S.C. § 2113 (d); 20 years on that based upon 18 U.S.C. § 2113(a); and 10 years on that based upon 18 U.S.C. § 2113(b). As has been stated, the sentences were directed to be served concurrently. On the theory that the determination of guilt on the §§ 2113(a) and 2113(b) offenses merged into the more aggravated § 2113(d) offense, defendant claims that his sentences were illegal. The sentence for the § 2113(d) offense was within the maximum permitted by law. The government concedes that if the judgment on this count

is affirmed, the judgments on the §§ 2113 (a) and (b) offenses should be vacated.

Defendant also argues that in closing argument to the jury the prosecutor improperly asserted as facts matters not in evidence. Our review of the record discloses that the prosecutor's remarks were amply supported by inferences irresistibly flowing from defendant's evidence. The prosecutor merely pointed out the inconsistency between the government's and the defendant's versions of what had transpired and told the jury it must choose between them.

apartment and had been unable to gain entrance. They informed her that a warrant had been issued for her husband, charging him with the robbery, and they asked her about his whereabouts. Defendant's wife informed the agents that her husband was not in their apartment, but she agreed to accompany the agents there and let them in so they could confirm this fact. En route to the apartment, Mrs. Retolaza answered a number of questions. Once at their destination she opened the door and was followed by the agents who, within a short period, determined that defendant was not present on the premises.

The agents remained in the apartment after their search and continued the interview of defendant's wife in the living room. She and one agent were seated on the couch, one agent was standing, and the third agent was seated elsewhere. She was interrogated as to the whereabouts of her husband, whether she had any knowledge of his implication in the robbery; whether she had seen him in possession of unusual amounts of money, and whether she had seen him in possession of any guns. After twenty to thirty minutes of questioning, Mrs. Retolaza admitted that her husband had turned money over to her and she had placed it in the freezing compartment of her refrigerator. She was requested by the agents to get the money, which she did. Next, Mrs. Retolaza admitted that her husband did have a gun, and she went to the couch where she and one of the special agents had been sitting, lifted the couch cushion and produced a sawed-off loaded shotgun.

 On these facts we conclude that a search, culminating in the seizure of the money and the guns, did not occur. The only search made by the agents was for the person of the defendant. It was conducted under the authority of the arrest warrant, and it was unsuccessful. Thereafter, as the district judge found, Mrs. Retolaza voluntarily produced the money and the gun. Although in her testimony she claimed that she was subjected to coercion in what she did, her testimony in this regard was disbelieved. We cannot say that the district judge erroneously resolved the issue of her credibility.[2]

 Defendant urges on us the decisions in Stoner v. State of California, 376 U.S. 483, 84 S.Ct. 889, 11 L.Ed.2d 856 (1964), and Amos v. United States, 255 U.S. 313, 41 S.Ct. 266, 65 L.Ed. 654 (1921). We have no quarrel with the proposition that they support that police may not take advantage of entry to a house under warrant of arrest or consent to conduct a search of the type which the Fourth Amendment requires be conducted under search warrant, issued upon a showing of probable cause. This case is simply not one of that class. The agents of the F.B.I., who had a warrant for defendant's arrest, were fully justified in requesting Mrs. Retolaza to give them entrance to her apartment to verify the non-presence of the defendant, notwithstanding that their own investigation from the outside, indicated that there was no one within. After entrance was obtained, the actual search was limited to one for the person of the defendant. When it was unsuccessful, the agents were fully justified in continuing their interview of Mrs. Retolaza on the premises in the absence of credible evidence that she requested them to leave or that she asserted a claim of the privilege of self-incrimination.

Undoubtedly, Mrs. Retolaza was at a psychological disadvantage during this interview, especially when she had concealed beneath a sofa cushion a loaded shotgun where she was sitting, the existence of which she earlier denied. We

2. The testimony of Mrs. Retolaza was controverted in all major respects by the testimony of the agents of the F.B.I., who were found by the district judge to be credible witnesses. Additionally, there was evidence that Mrs. Retolaza on several occasions was in fear of bodily harm from her husband. Such evidence was an additional factor which the district judge properly could consider as affecting her truthfulness when she testified in support of the motion to suppress.

cannot say, however, that her will was so overpowered that her production of the money and the gun were rendered involuntary acts on her part so as to constitute their production an illegal search and seizure. She was not under arrest, or threatened with arrest. It was she who identified what incriminating articles were secreted on the premises, and it was she who produced them. Cf., United States v. Smith, 308 F.2d 657 (2 Cir. 1962); Rice v. Warden, Maryland State Penitentiary, 237 F.Supp. 463 (D.Md. 1964), aff'd., unpublished memo. opinion (No. 10112, 4 Cir. 1965).

We find no illegal search and seizure.

## II

At trial after the testimony of each of the two bank employees who identified defendant, the prosecutor, in the presence of the jury, stated for the record that he had supplied defendant's counsel "with Jencks material, that is, any statements made by this witness, so that he may have it available for the purpose of cross-examination." No objection to the making of the statement was lodged.[3]

Defendant urges that in light of what happened Schoppel v. United States, 270 F.2d 413 (4 Cir. 1959), and Johnson v. United States, 121 U.S.App.D.C. 19, 347 F.2d 803 (1965), require reversal. We disagree.

In Schoppel the prosecutor, in examining government witnesses, took care to establish by a preliminary question that the witness had given a statement to the F.B.I. and then handed it to defense counsel in the presence of the jury. We condemned such tactics on the part of counsel for the government, yet we concluded that the error was harmless because there was no basis to conclude that the defendant had been prejudiced thereby. The vice in what was condemned was that the prosecutor bolstered the witnesses' testimony indirectly by indicating to the jury that consistent declarations had been made to the investigators. In the case at bar we think there was considerably less likelihood that a similar thought was imparted to the jury. Moreover, in this case, like Schoppel, there was ample evidence establishing defendant's guilt; and, as the case developed, defendant's mental competence and not his identity as the robber became the crucial issue, so that we cannot conclude that the defendant was prejudiced by the prosecutor's two statements.

In the Johnson case the prosecutor, in closing argument, told the jury that he had supplied defendant's counsel with Jencks Act statements, argued the significance of the lack of any effort to impeach the witness, and stated that in fact the testimony of the witnesses was strictly in accord with his written statement. In reversing the conviction and ordering a new trial because of the manifest unfairness of the prosecutor's argument about evidence that was held to be inadmissible at the trial, the Court laid down a rule of procedure that "in order to avoid the undue prejudice which may arise from the jury's knowledge that Jencks Act statements were available to the accused, motions for their production should be made outside the hearing of the jury." Id., 347 F.2d p. 806.

The instant case does not involve the considerations which led to reversal in Johnson and, hence, we do not think that Johnson requires the result for which defendant contends. We agree, however, that the possibility of prejudice which may accrue to a defendant if the jury has knowledge that Jencks Act material is furnished to his counsel is sufficiently great that as a rule of practice in this Circuit motions for the production of such material and statements for the record that such material has been furnished should be made outside of the hearing of the jury, that is to say, while the jury is not present in the courtroom, or at the bench, where the jury cannot hear what transpires.

3. Indeed, defendant's then counsel replied to one such statement, "if * * * [the prosecutor] wants to give it to me, that's nice of him."

### III

Defendant's contention relating to the cross-examination of his psychiatric witness and the scope of rebuttal arose in this context: Defendant called as a witness to support his plea of insanity Dr. Philip F. Lerner, a physician specializing in neurology and psychiatry, who practices in Baltimore and who examined the defendant on two occasions. In the course of examining Dr. Lerner, then defense counsel had him read a portion of a written report which he had prepared, in which he stated, *inter alia*, that although defendant " * * * lacks the sense of capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law * * I believe that he is able to assist his attorneys in his defense." During the course of his examination, Dr. Lerner also testified that he had elicited from the defendant a statement that "he does not wish to live." The doctor expressed the opinion that the defendant on the date of the commission of the crime was insane under the test prescribed by the American Law Institute in its Model Penal Code, but that he was not a defective delinquent under the Maryland Defective Delinquent Act.

On cross-examination the doctor was asked without objection how he was able to reach the opinion that the defendant, under the A.L.I. test, was mentally incompetent or insane and yet was mentally competent to stand trial and assist in his own defense. After the doctor's initial answer to this question, additional cross-examination to elicit the reasons for the distinction was objected to, but the objections were overruled.

During the course of direct and cross-examination Dr. Lerner testified that defendant "hasn't got good judgment; he can't think too well," and "that he could just not carry out sensible thinking."

After Dr. Lerner's testimony had been completed the government, over objection, was permitted to prove that on March 1, 1966, defendant had made arrangements for the use of a codefendant's automobile, had placed a fictitious call to the Baltimore County police in order to have a policeman in the area called away, had arranged for his codefendant to drive him to a hotel in Washington, gave directions to the codefendant how to get to the hotel, gave the codefendant money to be transmitted to defendant's wife, instructed his codefendant to purchase money orders for defendant's wife so that bills could be paid, came to Baltimore the next day to arrange further for the well-being of his wife, once again had the codefendant drive him to Washington, and designated an expression of warning to be used over the telephone in the event that the police became suspicious.

■■ We have little doubt that the difference in standards governing a defendant's competence to stand trial from those which govern his mental capacity to commit a crime ordinarily would preclude a prosecutor from cross-examining a psychiatrist who has expressed an opinion on one about the other. In the usual case, a prosecutor should not thus be permitted to confuse the two inquiries in his examination of a psychiatric witness. But here the defendant's psychiatrist, at the instance of defendant's counsel, expressed the opinion that defendant lacked mental capacity to commit a crime, but possessed mental competence to stand trial. Under such circumstances, the cross-examination of Dr. Lerner was permissible and proper.

Dr. Lerner's testimony, which we have recited, also provided a proper basis for receipt of the rebuttal evidence. When the jury had been told that the defendant lacked "good judgment," could not "think too well" and "could not carry out sensible thinking," there was no abuse of discretion on the part of the district judge in permitting the jury to learn additional details about how the defendant planned the crime and how he behaved after the crime had been committed in order to determine for themselves the persuasiveness of the medical opinion.

In neither respect do we find error.

## IV

The instructions given by the district court on the issue of sanity were based upon the American Law Institute test. Defendant does not contend that the court erred in this regard, and in the recent case of United States v. Chandler, 393 F. 2d 920 (4 Cir. 1968), we approved use of that test. However, defendant complains of two particular aspects of the insanity instructions.

■ First, defendant contends that the trial court improperly placed the burden upon him to prove his sanity beyond a reasonable doubt by instructing the jury that in order to find for him on the sanity issue, it "must find from all of the evidence in this case beyond a reasonable doubt that a sociopathic personality or such other mental disease or defect is a mental disease or defect as those terms are used in the A.L.I. test." [4] This part of the instruction was erroneous, but the short answer to defendant's contention is that the trial judge recognized his own error and remedied it. Thus, immediately after giving the instruction quoted above, he said: "Now, ladies and gentlemen, I want to go over the last part again because I want to make it clear to you that at one point I used the words 'beyond a reasonable doubt' when, quite frankly, I did not mean to use them, and I want to go back over that again so that this will be perfectly clear to you." The district judge then explained that any finding made against the defendant must be made on the basis that the jury finds beyond a reasonable doubt, and unless the jury can make any essential finding beyond a reasonable doubt, then it must find in favor of defendant. Manifestly, the district judge's inadvertence was corrected.

Defendant's second contention raises a more difficult problem. After extensive consultation with counsel for both parties (for three and one-half hours) on the insanity instructions, *and without objection by defense counsel*, the district judge gave the following instruction, based upon the Seventh Circuit Manual on Jury Instructions, § 5.03, 33 F.R.D. 523:

"The law presumes that a defendant is sane. This presumption [however] is rebuttable. Where a defendant introduces some evidence that he had a mental disease or defect at the time of the commission of the crime charged, the prosecution must establish beyond a reasonable doubt that the defendant did not have a mental disease, or that despite the mental disease, he had the capacity either to know the criminality of his conduct or to conform his conduct to the requirements of law."

In Doyle v. United States, 366 F.2d 394 (9 Cir. 1966), almost exactly the same instruction was held to be erroneous on the ground that it allowed the jury to make a determination that the defendant had not introduced sufficient evidence to inject the issue of insanity into the case and thus to shift the burden of proof to the government on the sanity issue, and that this determination is not within the province of the jury but is to be made by the judge.

■ We agree that it is the function of the judge to determine whether the burden of proof has shifted. See Hall v. United States, 295 F.2d 26 (4 Cir. 1961), and the numerous authorities cited in *Doyle*. And we agree that: "The vice in the instruction given here is that it is impossible to ascertain what the jury did pursuant to it. The jury may well have decided that the defendant had not fulfilled the burden of 'making some showing of insanity or mental irresponsibility.' " Doyle v. United States, supra,

---

4. As part of the same sentence, the district judge unequivocally stated that in order to find defendant sane the jury must find "beyond a reasonable doubt that the defendant was not suffering from such mental disease or defect as to cause him to lack substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law * * *."

366 F.2d pp. 400–401.[5] However, we do not agree that in the absence of objection the giving of this instruction constituted "plain error," as required by Rule 52(b), F.R.Crim.P., to justify reversal of the conviction.

■■■ Defendant's psychiatrist, Dr. Lerner, was unequivocal in his opinion that defendant was insane under the A.L.I. test which was freely discussed in the presence of the jury. Throughout its arguments to the jury, the government, as well as defendant, repeatedly reminded the jury that the burden of proving beyond a reasonable doubt that the defendant was sane rested on the government. In his charge, except for the portion under attack, the district judge told the jury in simple and direct language that the defendant "had raised the issue of his insanity at the time of the alleged offense," he submitted the issue of sanity to the jury and he told the jury that in order to hold the defendant criminally culpable it must find beyond a reasonable doubt that the government had proved defendant sane. Under these circumstances, we think it only theoretical, but not actual, that the jury may have been misled by the erroneous instruction and resolved the issue on the ground that defendant had failed to make some showing of insanity or mental irresponsibility.

## V

In summary, we find that no reversible error occurred at the trial. We affirm the judgment entered on the third count of the indictment and, in accordance with the government's concession, we remand the case so that the judgment on the first and second counts of the indictment may be stricken.

Affirmed and remanded.

## ON PETITION FOR REHEARING

### PER CURIAM:

In his petition for rehearing, otherwise repetitive of arguments advanced in the initial appeal which we deem sufficiently answered in the opinion that we have filed, defendant presses on us Bumper v. State of North Carolina, 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968) as dispositive of the issue of the alleged illegal search and seizure.

In *Bumper,* insofar as pertinent here, it was held that a defendant was convicted in violation of his Fourth Amendment rights when there was admitted into evidence against him a rifle seized as a result of a search to which the defendant's grandmother, with whom defendant lived, ostensibly consented, but only after the searching officers represented that they had a search warrant. Specifically, the Court concluded:

"When a law enforcement officer claims authority to search a home under a warrant, he announces in effect that the occupant has no right to resist the search. The situation is instinct with coercion—albeit colorably lawful coercion. Where there is coercion there cannot be consent." 391 U.S. 550, 88 S.Ct. 1792, 20 L.Ed.2d 803.

*Bumper,* as the citations contained therein demonstrate, announced no new or novel constitutional rule; and on the facts in the instant case, we think *Bumper* is inapposite.

■■■ In the case at bar, the agents did not have, nor did they claim to have, a search warrant. They had only an arrest warrant commanding defendant's arrest. They so advised defendant's wife, and in her presence conducted a search of her apartment to ascertain

---

5. Since in the instruction given in the instant case the presumption of sanity was mentioned only in regard to the initial shifting of the burden of proof to the government by the introduction of "some evidence" of insanity, and was assigned no further role, we need not now consider the propriety of an instruction which states that the presumption of sanity remains in the case after the burden of proof has shifted and the issue submitted to the jury. Compare Keys v. United States, 120 U.S.App.D.C. 343, 346 F.2d 824 (1965), with Hackworth v. United States, 380 F.2d 19 (5 Cir. 1967) (Godbold, J., concurring specially). But see, Otney v. United States, 340 F.2d 696, 698–699 (10 Cir. 1965).

that defendant was not present or hidden on the premises. The facts concerning seizure of the money and the gun are stated in the main opinion. It suffices, in denying the petition, to stress that the agents never claimed the right to search for the money or the gun. The presence of these became known when Mrs. Retolaza admitted that they were hidden and she, in response to their request, which was unsupported by any claim by the agents that they had a right to enforce compliance, produced the articles. After full evidentiary exploration, the district judge found, on substantial evidence, that Mrs. Retolaza's actions were taken freely and voluntarily. We agree.

Rehearing is denied.