567 P.2d 786

`The STATE of Arizona, Appellee,

v.

Frank Anthony PERRY, Appellant.

No. 2 CA–CR 872.

Court of Appeals of Arizona,
Division 2.

Jan. 13, 1977.

Rehearing Denied Feb. 28, 1977.

Review Denied July 22, 1977.

Bruce E. Babbitt, Atty. Gen., by Russell Piccoli, Asst. Atty. Gen., Tucson, for appellee.

Stanton Bloom, Tucson, for appellant.

## OPINION

HOWARD, Chief Judge.

Appellant was convicted by a jury of the armed rape and armed kidnapping of a Miss F, and the kidnapping for rape and armed rape of a Mrs. N. He was sentenced to serve time in the Arizona State Prison.

The record shows that on September 23, 1975, at approximately 6:30 p. m. Miss F was hitchhiking on East Broadway in Tucson, Arizona. She had just been visiting at a friend's house and was headed home. She was picked up by appellant who was driving a Ford Galaxie sedan. As they started down Broadway towards the downtown area, appellant turned off to the right telling Miss F that he was going to his sister's house to pick up some silver but that he would take her all the way to her destination, East Speedway and North Euclid. They engaged in small talk and when it appeared to Miss F that they seemed to be driving away from the city, she asked appellant where his sister lived and he replied that she lived in the foothills. Miss F was getting frightened and asked appellant to let her out of the car so she could get a ride from someone else. He refused to do so

and shortly thereafter stopped the car. He then reached under the seat, pulled out a revolver, stuck it into her side and told her that he was going to tape her hands. When she asked what he was going to do, he said he was going to rape her and pushed the revolver harder into her side as he taped her wrists together. Appellant then started his car and drove onto a gravel road. While he was driving, he grabbed her around the neck and ripped off her shirt. Miss F kept saying to appellant, "Don't kill me", and he kept answering "If you please me."

After appellant stopped the car at the top of a hill, he put a knife to her back and told her to undress. He also took the knife and cut the tape off her wrists and demanded that she undress him. She started to unbutton his shirt but he then commenced taking his clothes off himself. While he was taking off his clothes, she noticed that he had placed the revolver on the driver's side of the car floor board and she slid the revolver over to her side. Appellant then raped Miss F twice. After appellant raped Miss F the second time, he jumped up and asked her whether she could kill him. He told her he had nothing to live for and that he was going to shoot her and shoot himself. Then he said he wanted her to shoot him and he reached down, got the gun, opened his car door and fired a shot. He told Miss F that he could kill her, bury her out there in the desert and nobody would find her. By the time they did, they would not be able to identify her, he said, and if he got caught for murder he would only get seven years but if he got caught for rape he would get life.

Appellant then started talking about statistics and math and how many men got off for rape and how many got away with it. Miss F convinced him that he would get into more trouble if he killed her and told him that she wouldn't report him to the police if he would let her out. After further conversation appellant headed back to town. On the way he told her his name. Appellant left Miss F off at Euclid and Speedway and she ran to her apartment where she was living with her cousin. She told her cousin what had happened and her cousin called the police. The police took Miss F to the hospital where she was examined and then was driven to her aunt's house. A photograph taken of Miss F showed several bruises on her right side where she had been poked by the revolver.

The events leading up to the rape of Mrs. N commenced in the late evening hours of September 29, 1975. At the time Thomas Ausman and his wife, Lou, were sitting around the pool in an apartment complex located at 6901 East Broadway, Tucson, and were watching a TV movie. A person whom they later identified as the appellant came up to the pool area and began talking with Mr. Ausman. While they were conversing, Mr. Ausman saw Mrs. N leave her apartment with a basket full of laundry. She was headed to the laundry room on the north side of the apartment complex. As she walked past the pool area, Mr. Ausman noticed that appellant was watching her. During the conversation with Mr. Ausman, appellant stated that he had a job in computers. After a while he asked the Ausmans where the laundry room was and upon receiving directions he departed. The Ausmans, a short while later, left the pool area and went back to their apartment.

Mrs. N, after she passed the pool area, went to the laundry room and put some clothes in the dryer. She then went back up to her apartment. About thirty minutes later, she returned to the laundry room. When she got there she noted that the light switch had been torn out of the wall, which she thought was very strange. As she went to open the laundry room door so she could let a little light from the courtyard into the laundry room, she saw a man coming down the sidewalk. She started to leave but the man grabbed her and dragged her screaming into the laundry room. He had his hand over her mouth and a knife over her throat. After a further struggle in the laundry room he told her not to scream. The man smelled strongly of body odor, a fact which Mrs. Ausman had also noticed about appellant when he was talking to her and her husband.

While in the laundry room, appellant taped Mrs. N's hands behind her back. She asked him if he was going to rape her and he said that he was. Appellant stuck a knife in her ribs and took her out of the laundry room to a pickup truck. The parking lot was dimly lit and she thought that the color of the pickup was dark green. Appellant made her sit down on the passenger side of the pickup and they left the parking lot. He told her to keep her eyes closed and then made her sit close to him. He started kissing her and fondling her breast. When she begged him to take her back, he said, "If you don't please me, then I'm not bringing you back." They drove through a populated area and then headed out on a dirt road. As they were driving through the populated area, Mrs. N did not keep her eyes closed all the time and was able to get a clear side view of appellant. When they got out into the desert, he stopped the pickup and raped her twice. As with Miss F, appellant cut the tape off Mrs. N's hands so she could take her clothes off prior to the rape. After he raped her the first time, appellant told her that she was the fifth girl he had raped and that one had turned him in but he had gotten off. Mrs. N told him that she would not report him if he took her back. After the second rape, appellant was trying to decide whether to kill her out there in the desert or whether to bring her back. He told her that he wouldn't have to worry about her reporting him because he would probably get two years for manslaughter if he killed her whereas if she did report him, he could get twenty to thirty years for kidnap, assault and rape.

After Mrs. N convinced appellant that she was not going to report him, he took her back on the condition that she keep her eyes closed all the time and not look at his face. He left her off at a K-Mart near her apartment and gave her a $5 bill from which he had wiped his fingerprints, telling her it was for a "piece of ass." He then told her to go into the K-Mart grocery store, and buy something. He said he would be watching her all the way and she had better not do anything because he would kill her baby. At that time it was approximately twenty-five minutes after three on the morning of September 30, 1975. She went into K-Mart, did as he had instructed and went back to the apartment.

When Mrs. N got back to her apartment she woke her husband and told him what had happened. Her husband wanted to call the police right away but she told him not to call because appellant had said that he was going to be watching and that if she did anything he was going to kill her baby and shoot her husband's leg off. The police were called later that morning by Mr. N.

While out in the desert, Mrs. N noticed that the upholstery on the seat of the pickup was ripped, exposing part of the foam rubber.

On September 29, 1975, a police officer who lived in the same apartment complex as Mrs. N heard a blood-curdling scream. He ran out in time to see a pickup truck departing from the parking area behind the laundry room. The parking area was not well lighted. He too thought that the pickup was dark green in color. He particularly noted that the pickup had a very loud muffler as if something were defective with its exhaust system. Subsequent police investigation and photos which were admitted into evidence reveal that appellant had a light blue, pickup truck whose upholstery was ripped in the front, thus exposing the foam rubber. A steak knife was also found in the driving compartment. Photographs taken of the pickup's exhaust system revealed a defect which would cause a loud muffler. Appellant admitted that the pickup had a loud muffler.

Appellant took the witness stand and admitted that he had picked up Miss F who was hitchhiking. He stated that she told him that her car was broken down and she needed $60 to repair it. He took this as a proposition and drove her out to the desert where, according to appellant, they had consensual sexual intercourse. He testified that he had offered Miss F a job but that she became angry when he would not give $60 immediately so she could get her car

repaired. He further testified that he fired the revolver and taped her hands in order to scare her because he was afraid she would try to blackmail him by reporting him for rape.

As far as Mrs. N was concerned, appellant testified that he had never seen her before.

Any further facts will be set forth as they are deemed necessary in discussing the issues with the questions presented.

Appellant has presented to us twenty-one questions. They are as follows:

"1. Was the pretrial photographic lineup and courthouse showup conducted by the police so unnecessarily suggestive and conducive to irreparable mistaken identifications as to deny the appellant due process of law?

2. Did the failure to notify and inform appellant and his attorney that the police were conducting pretrial, postindictment, showup confrontations on appellant violate his Sixth Amendment rights to the United States Constitution?

3. Were the in-court identifications of appellant proven by clear and convincing evidence to have been made from independent origin arising from the witnesses' uninfluenced observation of the accused?

4. Did the failure of the trial court to suppress the identifications of [Mrs. N] on the second offense deprive the appellant of a fair trial on the first offense?

5. Did the trial court err in failing to declare a mistrial *sua sponte* when a police officer indicated the appellant had a 'past record?'

6. Did the trial court err in failing to declare a mistrial *sua sponte* when the prosecution introduced a photograph into evidence obviously indicating the appellant had a prior criminal background?

7. Was the appellant denied due process of law under the Fourteenth Amendment of the United States Constitution when the prosecutor elicited testimony, over objection, indicating that the appellant did not want to tape the statement he gave to the police?

8. Did the trial court err in allowing the prosecution to introduce compsites made by the police of the appellant?

9. Did the trial court err in allowing into evidence, over objection, a police officer's testimony that was a narrative corroborating a prosecutrix's testimony that did not amount to an excited utterance?

10. Did the prosecutor improperly introduce testimony from [Miss F] that she could have obtained money from her parents or her aunt?

11. Did the trial court erroneously admit into evidence, over objection, testimony relative to surveillance activities conducted by the police upon appellant?

12. Did the prosecutor introduce improper evidence that the State's witness gave taped and oral statements to the police and thereby indicate appellant was unable to impeach these witnesses?

13. Did the prosecutor improperly elicit a statement from a police officer that appellant had given an inconsistent story to the police?

14. Did the prosecutor improperly elicit a statement from a police officer, over objection, that appellant's attorney told the police appellant was nervous at the time of his arrest?

15. Was the appellant proven guilty beyond a reasonable doubt on the [Mrs. N] charges and thereby prejudiced on the [Miss F] charge?

16. Did the trial court improperly rule as a matter of law and abuse its discretion in holding severance unnecessary to promote a fair determination of guilt or innocence?

17. Did the trial court's refusal to sever deprive appellant of his Fifth Amendment right not to be a witness against himself and his Sixth Amendment right to trial by an impartial jury?

18. Did the trial court err in failing to instruct the jury on the issue of identification?

19. Did the trial court err in improperly instructing the jury on kidnapping?

20. Did the trial court err in improperly instructing the jury on the element of consent?

21. Was appellant denied his rights under the Sixth and Fourteenth Amendments to the United States Constitution when his counsel failed to effectively assist him in his defense?"

## QUESTIONS WAIVED BY FAILURE TO OBJECT

■ As to Questions 8, 10 and 11, no objection was made in the trial court and therefore appellant is precluded from raising on appeal these issues. *State v. Tostado*, 111 Ariz. 98, 523 P.2d 795 (1974).

## PRETRIAL AND IN-COURT IDENTIFICATIONS

■ Under this heading we shall consider appellant's Questions 1 through 4 and Question 18. Appellant first contends that the method employed in the pretrial identification by Mrs. N was unduly suggestive and that her in-court identification was therefore tainted. We do not agree. On October 3, 1975, three days after she was raped, Mrs. N was shown a group of nine photographs of different individuals, one of which was a ten year old photograph of appellant. Mrs. N selected the photograph of appellant and another photograph from among the nine as being the two which resembled her attacker. Of these two, she selected the one which was not appellant's photograph as more closely resembling the man who raped her. On October 7, 1975, Mrs. N accompanied Officer Martha Natta to the downtown governmental complex area for the purpose of seeing whether Mrs. N could identify anyone there as the man who raped her. Officer Natta knew that appellant was going to be there with his attorney for arraignment on the F rape charge. However, this information was not given to Mrs. N.

Officer Natta and Mrs. N first went to the fourth and fifth floors of the new courts building. Since it was still early in the morning and not many people were there, they went over to the VD clinic in the health and welfare building. There were several men sitting there. They then went to the city courts building and looked into the courtrooms where trials were about to start and into a large courtroom where arraignments were about to take place. In the large courtroom there were about thirty men and Mrs. N was asked to look at and study every man in the courtroom. They then went to the old courthouse building where Mrs. N was asked to observe about thirty or forty men. After that they went to Division VII in the new courts building where Officer Natta thought appellant was going to be arraigned. Several people were there, none of whom was appellant. Officer Natta then decided to take Mrs. N back to the fourth floor. As they got off the elevator Officer Natta noticed about a dozen people in the fourth floor lobby. She saw appellant standing there with his attorney and she looked away, not wanting to give any indication to Mrs. N that appellant was there. Mrs. N immediately reacted when she looked in appellant's direction. She pointed to appellant and said that he could be the man. Mrs. N was asked to take a closer look and after looking at him from a distance of about seven to ten feet, she told Officer Natta that appellant was the man who had raped her. Officer Natta then placed appellant under arrest for the rape of Mrs. N. Mrs. N stated that she had looked at between seventy to one hundred men in the governmental complex area prior to identifying appellant.

At a hearing pursuant to *State v. Dessureault*, 104 Ariz. 380, 453 P.2d 951 (1969), Mrs. N testified that as appellant was driving her to the area where the rape occurred she got a good side view of appellant since they were still in lighted parts of town; also that at one point during the rape he made her get on top of him and have intercourse and at that time she could see his face, even though it was dark. She further stated that her identification of him in the courts building was from her independent recollection and observation and not because of any photos that had been shown to her.

Pursuant to *Dessureault*, the trial court found that the pretrial identification was not unduly suggestive and that, by clear and convincing evidence, the in-court identification was not tainted. The record amply justifies this conclusion and the trial court did not err in denying appellant's motion to suppress the pretrial and in-court identification of appellant by Mrs. N.

Appellant further claims that his right to counsel under the Sixth Amendment to the United States Constitution was violated by the identification procedure which occurred at the courthouse. He contends that the procedure constituted a "lineup" and that his counsel should have been notified and allowed to be present under the law set forth in *United States v. Wade*, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967). Since he had been indicted on the F rape, he contends that the procedure for identification was post-indictment. We do not agree. Assuming arguendo that the procedure used by the state constituted a "lineup", appellant is not entitled to the presence of counsel at pre-information or pre-indictment proceedings. *State v. Flynn*, 109 Ariz. 545, 514 P.2d 466 (1973). Appellant had not yet been indicted for the N rape. In fact, he had not even been arrested for that rape. The fact that appellant was being represented by counsel on the F rape and had been indicted for the F rape does not bring appellant within the parameters of *Wade*.

We are equally unable to agree with appellant's contention that the trial court erred when it refused to instruct the jury on identification as set forth in *State v. Dessureault*, supra. As we held in *State v. Harris*, 23 Ariz.App. 358, 533 P.2d 569 (1975), the *Dessureault* instruction is only warranted if the trial court finds that the pretrial identification was unduly suggestive.

### REFERENCE TO PRIOR RECORD

In Questions 5 and 6, appellant contends that the trial court erred in not granting, sua sponte, a mistrial. Miss F testified that the day after the rape a deputy sheriff showed her a photograph which she identified as being appellant. Appellant claims this was reversible error since it necessarily implied that appellant had a prior criminal record because the sheriff was able to obtain a photograph within a day after the rape. Appellant did not object to this testimony.

Sgt. McKinley testified that he wanted to show Miss F a picture of appellant and therefore he went to their records division and pulled photographs and past records. Appellant did object to this testimony. The trial court told defense counsel that it would grant a mistrial if requested by appellant because of Sgt. McKinley's testimony. Counsel told the court that he did not want a mistrial and when the court offered to strike the testimony from the record, counsel stated that he did not want the court to do so because it would just call further attention to Sgt. McKinley's testimony. Appellant claims that fundamental error existed in both instances which could not be waived and it was incumbent on the court, sua sponte, to declare a mistrial. This contention is without merit. The admission of such testimony is not fundamental error, *State v. Rocco*, 108 Ariz. 380, 499 P.2d 95 (1972), nor can appellant now complain that the trial court did not grant a mistrial when appellant refused to allow the court to do so.

### EVIDENCE THAT APPELLANT DID NOT WANT TO TAPE STATEMENT

At the time of his arrest on the F charge after appellant was given the *Miranda* warning, he opted to tell a deputy sheriff his version of the incident with Miss F. He was then asked if he would give a taped statement and he replied he would not. Appellant claims that it was prejudicial error for the prosecutor to introduce evidence that appellant did not want to talk to the police after he had been advised of his *Miranda* rights. While it is true that the state may not seek to impeach a defendant's exculpatory statements told for the first time at trial by cross-examining the

defendant about his failure to have told the story after receiving his *Miranda* warning at the time of his arrest, *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), that is not the situation here. Appellant was not silent after getting his *Miranda* warning. He gave an oral statement. The introduction of testimony to the effect that appellant refused to tape the statement which he had previously given to the sheriff was admissible and did not impermissibly penalize his right to remain silent. Cf. *State v. Lee*, 114 Ariz. 101, 559 P.2d 657 (filed Dec. 6, 1976); *U. S. v. Haro-Portillo*, 531 F.2d 962 (9th Cir. 1976).

### THE EXCITED UTTERANCE

Appellant contends the trial court committed prejudicial error when it allowed into evidence over his objection the testimony of Deputy Sheriff Miller as to what Miss F had told him concerning the incident when he saw her at the hospital. Miss F's cousin testified that when Miss F came to their apartment at approximately 9:30 p. m. on September 23, 1975, she was in a state of shock, crying and told her that she had been raped. Her cousin called the police who came to the apartment and then took her to the hospital. Miss F was taken to the examination room where she was seen by Deputy Miller prior to being examined by any doctor. Deputy Miller observed that Miss F was upset, extremely nervous, and was crying. He asked her what had happened and she told him the name of the man who had raped her and the details of the incident.

A spontaneous utterance has been defined as a statement or exclamation made immediately after some exciting occasion by a participant or spectator and asserting the circumstances of that occasion as it is observed by him. *Keefe v. State*, 50 Ariz. 293, 72 P.2d 425 (1937). The basis for this hearsay exception is the belief that the exciting event has produced a shock or nervous excitement which will make it likely the speaker is relating the truth. *Keefe v. State*, supra. In *State v. Woolery*, 93 Ariz. 76, 378 P.2d 751 (1963), the court set

forth three prerequisites for application of the exception: (1) There must be a startling event; (2) the words spoken must be spoken soon after the event so as not to give the person speaking the words a time to fabricate; and (3) the words spoken must relate to the startling event. Time is not the sole test for either the admission or rejection of such proof. See also, *State v. Owen*, 94 Ariz. 404, 385 P.2d 700 (1963), vacated on other grounds, 378 U.S. 574, 84 S.Ct. 1932, 12 L.Ed.2d 1041 (1964). In the *Owen* case, the statements were made one and one-half hours after the incident.

While it is unclear as to the exact time the statements were made to Deputy Miller, it is clear that a long period of time had not elapsed. It is equally clear that the emotional condition which existed when Miss F first told her cousin that she had been raped was still operating when she talked to Deputy Miller. Under these circumstances the court did not err in admitting such evidence.

### EVIDENCE THAT STATEMENTS HAD BEEN TAKEN BY POLICE OF THE STATE'S WITNESSES

The state elicited testimony from various police officers that the victims had given statements to them. At one point an officer was asked whether or not Miss F's statement had been typed up and whether or not defense counsel had a copy of the statements. He replied that he believed he did.

Relying on the case of *Schoppel v. United States*, 270 F.2d 413 (4th Cir. 1959), appellant claims that we should reverse even though no objection was made below to such testimony. He contends that elicitation of such testimony indirectly tells the jury that the defense is unable to impeach the witnesses. In *Schoppel*, the court held that where a cross-examiner had endeavored to discredit a witness by prior inconsistent statements, it is permissible to offset the damage by showing prior consistent utterances. It held that it was not proper, however, in the state's case in chief to seek

corroborative support of a witness by showing that after the event under inquiry and before the trial the witness made statements to the same effect. In *Schoppel*, the district attorney, upon calling the witness to the stand, proceeded first to establish that a statement had been given to the FBI and then handed it to defense counsel, in the presence of the jury. The court condemned the tactics of the state's attorney and stated that it would reverse even though no objection had been made except for the fact that under the factual circumstances there was overwhelming evidence of Schoppel's guilt.

In the later case of *United States v. Retolaza*, 398 F.2d 235 (4th Cir. 1968), a case not cited to us by appellant, the prosecutor, after the testimony of each of his key witnesses who identified the defendant, stated for the record in the presence of the jury, that he had supplied defendant's counsel "with Jencks material, that is, any statements made by this witness, so that he may have it available for the purpose of cross-examination." No objection was made to the statements. The defendant urged that reversal was required based upon *Schoppel v. United States*, supra. The court disagreed, pointing out, inter alia, that the prosecutor in *Schoppel* took care in examining the government's witnesses to establish by a preliminary question that the witnesses had given a statement to the FBI and then handed it to defense counsel in the presence of the jury. The court noted this procedure was condemned in *Schoppel* because it allowed the prosecutor to bolster the witnesses' testimony indirectly by indicating to the jury that consistent declarations had been made to the investigators. However, the *Retolaza* court thought that there was considerably less likelihood in the case before them that a similar thought was imparted to the jury.

 We believe the factual situation here is more akin to *Retolaza* than *Schoppel*. If there was any error, it was not fundamental error and any right to raise the issue on appeal was waived by failure to object at trial. *State v. Tostado*, supra.

## TESTIMONY OF A PRIOR INCONSISTENT STATEMENT

 After appellant had given his version of the F incident to the law enforcement officers at his residence, he was taken to the sheriff's office where he was re-advised of his rights. Deputy Cassidy, testified that at the sheriff's department "he (appellant) related a story from start to finish that was inconsistent." Defense counsel objected to this answer by Deputy Cassidy, it was stricken from the record, and the jury was told to disregard it. The jurors had the opportunity to hear what appellant had told the officers both at his residence and at the sheriff's department and therefore had a chance to evaluate for themselves whether or not there were any inconsistencies. The striking of the testimony and the court's admonition suffice to cure any error.

## THE STATEMENT ABOUT BEING "NERVOUS"

 Appellant contends that the prosecutor improperly elicited a statement from a police officer, over objection, that appellant's attorney told the police officer that appellant was nervous at the time of his arrest. A reading of the trial testimony makes it clear it was not appellant the attorney was talking about but the attorney himself who was nervous. There was therefore no error.

## FAILURE TO SEVER

Appellant claims that it was reversible error for the trial court to refuse to sever the trial of the N rape from the F rape. He also contends that the refusal to sever deprived him of his Fifth Amendment right not to be a witness against himself and his Sixth Amendment right to trial by an impartial jury. We do not agree with appellant on any of these contentions.

 Rule 13.3(a)(3) provides that offenses may be joined in an indictment if they are part of a common scheme or plan.

The phrase "common scheme or plan" as employed in Rule 13.3(a) bears the same meaning as "common scheme or plan" used in the context of the exception to the rule against the use of evidence in one prosecution tending to prove the commission of a crime distinct and independent of the one for which the accused is on trial. *State v. Dale*, 113 Ariz. 212, 550 P.2d 83 (1976). In both the F case and the N case the victims were taken by automobile to a remote area of the desert. In both instances the hands of the victims were taped but then freed so that the victims could undress before they were raped. Other similarities include the statement by appellant that he would bring the victims back "if they pleased him," the seeming indecision as to whether to kill the victim because of a lighter sentence for homicide than for rape and the threat of physical harm if they told anybody what had happened. We think these similarities exist where one would normally expect to find differences. There was no error in joining the offenses. *State v. Kelly*, 111 Ariz. 181, 526 P.2d 720 (1974); *State v. Thomas*, 110 Ariz. 106, 515 P.2d 851 (1973); *State v. Finley*, 85 Ariz. 327, 338 P.2d 790 (1959).

Appellant again moved at trial for a severance of the counts with a view to bringing himself within the ruling in *State v. Tuell*, 112 Ariz. 340, 541 P.2d 1142 (1975). Appellant represented to the trial court that while he fully intended to testify on the F rape, he had no intention of testifying in regard to the N rape and was going to rely on an alibi witness. Appellant further told the court that if it refused to sever, it would have a chilling effect on his right against self-incrimination since having taken the stand to testify on the F rape, he could be cross-examined as to the N rape.

Appellant contends that *State v. Tuell*, supra, mandates reversal in his case. We do not agree. *State v. Tuell*, supra, did not involve a joinder of counts since Count I and Count II had been severed prior to trial. During the trial on Count I the trial court denied a motion in limine and indicated that it would allow prior bad acts to be introduced into evidence. The prior bad acts related to Count II which had not yet been tried. Because the trial court was going to allow evidence relating to Count II to be admitted into evidence, the defendant's attorney told the court that although it had always been his intention to put his client on the witness stand as far as Count I was concerned, he could not do so in view of the court's ruling because the defendant might be asked questions which would incriminate him as far as the pending charges were concerned. Accordingly, in *Tuell*, the defendant did not take the witness stand.

The situation here differs from *Tuell*. The offenses here were in fact joined for trial. It was not until after the evidence on the N rape had been already introduced that appellant made his *Tuell* representations to the court. Assuming, arguendo, the applicability of *Tuell* to a trial where offenses have been joined, appellant was untimely in making his *Tuell* representation. And, even if appellant had made a timely *Tuell* representation, we do not believe that the court would have erred in denying a severance. In the leading case of *Cross v. United States*, 118 U.S.App.D.C. 324, 335 F.2d 987 (1964), the court held:

"Prejudice may develop when an accused wishes to testify on one but not the other of two joined offenses which are clearly distinct in time, place and evidence. His decision whether to testify will reflect a balancing of several factors with respect to each count: the evidence against him, the availability of defense evidence other than his testimony, the plausibility and substantiality of his testimony, the possible effects of demeanor, impeachment, and cross-examination. But if the two charges are joined for trial, it is not possible for him to weigh these factors separately as to each count. If he testifies on one count, he runs the risk that any adverse effects will influence the jury's consideration of the other count. Thus he bears the risk on both counts, although he may benefit on only one. Moreover, a defendant's silence on one count would be damaging in the face of his express deni-

al of the other. Thus he may be coerced into testifying on the count upon which he wished to remain silent." (Footnotes omitted) 335 F.2d at 989.

The ruling in *Cross* was not based upon constitutional grounds, but upon a rule of federal procedure similar to Rule 13.4 of our Rules of Criminal Procedure. In 1969, the same court that decided *Cross* decided the case of *Bradley v. United States*, 140 U.S.App.D.C. 7, 433 F.2d 1113 (1969). There we find the court explaining its holding in *Cross*:

> "We have, however, been careful to point out that the accused's election to testify on some but not all of the charges on trial does not automatically require a severance. 'Such a rule,' we said in our Baker opinion 'in fact, would divest the court of all control over the matter of severance and entrust it to the defendant.' There remains with the trial judge, we have indicated plainly, a discretion in the matter, though a discretion within limits narrowly confined by the exigencies of the situation. In the end, it is incumbent upon the judge 'to weigh the considerations of "economy and expedition in judicial administration" against the defendant's interest in having a free choice with respect to testifying,' and to grant or deny the severance accordingly." (Footnotes omitted). 433 F.2d at 1112.

The court then went on to point out that in *Cross* the two joined offenses were not "clearly distinct in time, place and evidence" whereas in the case which it was considering the evidence was mutually admissible in the trial of either count.

█ Finally, we have the court in *Holmes v. Gray*, 526 F.2d 622 (7th Cir. 1975) holding, on constitutional grounds, that where the evidence in the two counts would be mutually admissible severance is not mandated. The *Holmes* court held that where joinder is proper, the Fifth Amendment is not violated because a defendant must elect to testify as to both charges or to none at all.

## THE KIDNAPPING INSTRUCTION

█ The trial court instructed the jury, inter alia, that the essence of kidnapping was not the distance the victim is transported but the unlawful compulsion against the will to go somewhere. Appellant cites the case of *People v. Daniels*, 71 Cal.2d 1119, 80 Cal.Rptr. 897, 459 P.2d 225 (1969), and similar cases for the proposition that where the movement is merely incidental to the commission of another *lesser* crime, it is insufficient to support a conviction for kidnapping. Appellant's argument and the California case of *People v. Daniels*, supra, were rejected by our Supreme Court in *State v. Soders*, 106 Ariz. 79, 471 P.2d 275 (1970), and again in *State v. Williams*, 111 Ariz. 222, 526 P.2d 1244 (1974).

As the court stated in *State v. Williams*, supra:

> "The essence of kidnap is not the distance the victim is transported but the unlawful compulsion against the will to go somewhere. [Citations omitted]
>
> Likewise, the essence of kidnap for rape under the statute in effect at the time is the asportation with intent to rape or holding with the intent to rape, and while the fact of the rape is itself good evidence of the defendant's intentions, the actual rape in itself is not a necessary element of the crime of kidnap for rape. It is the intention that is controlling. We hold, therefore, that a person may be guilty of both kidnap for rape and rape or, as here, armed rape." 111 Ariz. at 224, 526 P.2d at 1246.

## THE INSTRUCTION ON RAPE

█ Appellant objected to the court's instruction on consent stating that the pertinent language was buried in the text of the instruction. He offered an instruction used in Illinois which in essence states that a victim must continue to resist as long as he has the power to do so. Such is not the law in Arizona. *Deffenbaugh v. State*, 32 Ariz. 212, 257 P. 27 (1927). The court's instruction on the issue of consent was proper.

## INEFFECTIVE COUNSEL

█ Appellant contends that he was denied effective assistance of counsel in the

trial court. A party will not be granted relief on the grounds of ineffectiveness of counsel unless a showing is made that the proceedings were reduced to a farce or sham. *State v. Smith*, 112 Ariz. 208, 540 P.2d 680 (1975). Our review shows that a vigorous defense was presented by his counsel in the trial court and this alleged error is without merit.

### FAILURE TO PROVE GUILT BEYOND A REASONABLE DOUBT ON THE CHARGES

■ Appellant lastly contends that the state failed to prove him guilty beyond a reasonable doubt of the charges concerning Mrs. N. The record belies this contention.

Affirmed.

HATHAWAY, and RICHMOND, JJ., concurring.